STATE of Iowa, Petitioner,

v.

**IOWA DISTRICT COURT IN AND FOR JOHNSON COUNTY, Joseph Thorton, Magistrate, Respondent.**

No. 2–59103.

Supreme Court of Iowa.

Nov. 17, 1976.

Jack W. Dooley, Johnson County Atty., and Steven K. Ristvedt, Asst. Johnson County Atty., for petitioner.

Reisetter & Megan, Iowa City, for respondent.

Heard by MOORE, C. J., and MASON, LeGRAND, UHLENHOPP and McCOR-MICK, JJ.

UHLENHOPP, Justice.

This original certiorari proceeding involves the validity of a search warrant. We granted the writ on the petition of the State prior to the trial of a criminal prosecution, after the district court sustained a defense motion to suppress evidence seized under the warrant. See *State v. Iowa District Court in and for Linn County*, 236 N.W.2d 54 (Iowa).

The case involves three searches, the latter two each growing out of the preceding one. The first one was without a warrant and the latter two were with warrants. Officers seized the evidence in question (marijuana and attendant paraphernalia) in the third search, which was under the second warrant. The validity of that warrant depends on the validity of the first warrant. The validity of the first warrant depends in turn upon the facts stated in the application for that warrant and in the magistrate's endorsed abstract, as well as on the validity of the original search without a warrant. See 79 C.J.S Searches & Seizures § 74 at 871.

The controlling facts are these. At about 9:50 p. m. on November 5, 1975, two Johnson County deputy sheriffs came upon a 1964 pickup truck proceeding erratically over the center line. The truck turned into a farm drive and stopped. It bore 1974 Minnesota license plates. Deputy Virgil L. Miller testified at the suppression hearing he thought the license plates had expired; the back plate was dented and dirty and the rear truck light was out. Apparently, however, the license plates did in fact have 1975 stickers.

The deputies pulled in behind the truck, alighted, and approached the truck. The truck had two occupants, William Willard, the driver and owner, and Francis Teterud, a passenger. The occupants smelled strongly of alcohol, and the truck contained opened beer bottles. By way of identification, Willard produced his driver's license, which had expired, a discharge from the army, and a release from a federal penitentiary. Teterud could not produce identification at first but did later.

Deputy Miller returned to the county car and ran a "wants or warrants" check on the two men, with negative results. After making that check he returned to the truck. At the subsequent suppression hearing he testified:

Q. (Assistant County Attorney) All right. Okay, after running the check and

getting the results back, what did you do at that point? A. I then returned to the vehicle and Deputy [Dennis] Claman was standing outside the passenger's side, and we were both observing the subjects and the contents that were plain to our eyes from the outside, and Mr. Willard said to Deputy Claman, "Would you like to check the vehicle?" At that time Deputy Claman said, "If you don't mind, yes." He said, "By all means, go ahead," and he lifted the seat up and—

Q. Okay, now, hold it just a minute. Were Mr. Willard and Mr. Teterud at this time inside the vehicle? A. No, they stepped out then.

Q. All right. Was there any request on the part of Deputy Claman as to his asking to search the vehicle? A. Deputy Claman did not ask to search it, Mr. Willard offered. Deputy Claman—he asked Deputy Claman, "Would you like to check the vehicle?" And Deputy Claman said, "If you don't mind, yes."

Q. Okay, and then what did Mr. Willard do at that point? A. Mr. Willard took his—I believe his right hand through the driver's side and lifted up the seat, like so. And you could see the contents behind the seat and on the floor behind the seat.

Q. Okay, now, we're talking about the back seat rest of the truck, or the seat of the seat, I guess? A. Well, the seat is all in one piece, and we're talking about lifting the seat up and we could see the contents that was stuck behind the backrest part of the seat—

Q. I see. A.—that would not be visible to the eye if it were in normal position.

Q. And what did you observe? A. I observed some pry bars and nail pullers, miscellaneous tools.

Q. Okay, did these have significance to you? A. They did to me. I investigated a break-in a few nights before where we had a blue nail puller used on a door at a rural farm break-in, and this is the same color of paint that we found on the door at the break-in. Also, the nail puller would have matched the description perfectly, the same type of nail puller used to gain entrance at this break-in. Also, there were some tools and a Craig tape player that were observed in the vehicle that matched the description of items taken from a break-in at River Products a few days prior to that.

The deputies also found a small amount of marijuana in the truck.

At a later point in his testimony, Deputy Miller again stated that Willard offered to let the officers check the truck. That later testimony did not vary from his first testimony. Near the conclusion of his testimony he reaffirmed that Willard suggested that the officers search the vehicle. He did not retreat at any point from his testimony on direct. No testimony was introduced contradicting his testimony.

The previous break-in at River Products involved a large amount of tools worth some $7000 and a Craig tape player.

The deputies arrested Willard for intoxication and expired driver's license and arrested Teterud for intoxication; the disposition of those charges does not appear. The deputies did not charge either of the men with operating the truck while under the influence of intoxicants. With assistance, the deputies brought the two men, the tools, and the tape player to headquarters. The two men gave their address as 320 River Street in Iowa City.

Investigation at headquarters revealed that Teterud was on parole to one Ackerman, who appeared at the deputies' request. One Vickroy, who owned the tape player stolen in the River Products break-in, also came to headquarters. He positively identified the tape player as his; it contained a recorded weather report he recognized, and the wires from the batteries were defective so that the player had to be operated on other current. He could not positively identify the tools as from River Products but stated they very possibly could be tools taken from there.

The deputies appeared before the local magistrate and requested a warrant to

search the two men's residence for more stolen River Products items. Deputy Miller signed and swore to the application for the warrant stating his source of facts to be "Personal observation and by previous knowledge by assisting in investigation of River Products B&E." Attached to the application were a two and one-half page, single-spaced list of the tools and tape player stolen from River Products and a one-page condensation by the sheriff of the same information. On those papers, the only items which corresponded to items found in the truck were a pair of leather gloves, two torch strikers, and the Craig tape player.

Deputy Miller's application named both Willard and Teterud followed by the address, 320 River St., Iowa City, Ia. Deputy Miller also stated in the application:

> Observed 1964 Blue Pickup bearing expired Minnesota registration plates. Stopped said vehicle and asked two occupants to exit the vehicle after smelling strong odor of alcohol and observing open beer bottles in vehicle. Driver of vehicle (Willard) admitted owning vehicle and voluntarily gave consent for search of said vehicle. The driver assisted in the search by voluntarily exposing certain burglary tools hidden behind the seat. Said tools similar to those used in several house B&Es occurring on October 29, 1975. Observed under front seat a Craig tape player, said tape player subsequently identified as the one taken in the October 22, 1975 B&E River Products Quarry in Johnson County. Also found numerous tools in the cab and bed of the truck matching description of tools taken also in the River Products B&E. A check of the tire imprints also matched imprints left at the scene of the River Products B&E on October 22, 1975. Also found in the bed of the pickup approximately 2 ounces of brown plant substance found by field presumptive test to be marijuana.

The affidavit of Vickroy was also attached to the application, stating:

> I, David M. E. Vickroy, state I am a mechanic employed by River Products Quarry and on October 22, 1975 did have stolen from my possession at River Products one Craig tape player, AM/FM radio combination which did contain one four track cassette on which was recorded a KRNA weather report. Upon being shown the recorder recovered the night of November 5, 1975 by deputy Virgil Miller I could identify it as one similar to that I had previously recorded. I also identified this because of a loose wire I had not fixed previous to the theft and which prevented the radio from operating off of the batteries. The model number matched that of the one stolen from me on the night of the break-in at River Products, October 22, 1975.

In addition, the magistrate heard oral testimony under oath and attached the following abstract to the application:

> *Virgil Miller.* R. R. 1, North Liberty. Deputy Sheriff. Tools used in break ins 10–29–75 left blue paint in areas where entry was gained by prying. Found nail pullers or crow bars in truck with similar color paint. Items underlined or circled on attachments were found in truck. Also 2 torch strikers. Occupants of truck uncommunicative. Parole officer of one confirmed present residence.

> *David Vickroy.* 926 E. Davenport, Iowa City. Employee of River Products. Worked night of break-in until midnight. Left Craig tape player there when leaving. Positively identifies equipment in officer's possession as the item stolen. It belongs to him. Affirms statements in affidavit as true. Reaffirms all statements therein.

The magistrate issued a warrant to search the residence at 320 River Street for tools and equipment from River Products, illegal drugs or narcotics, and any other contraband illegally possessed.

Officers promptly proceeded to execute the warrant. They found several occupants in the River Street residence and an astonishing quantity of purported drugs and

drug paraphernalia which, when eventually inventoried, took some four pages to list. Upon encountering these articles in plain sight in the residence the officers returned to the magistrate and sought and obtained a second warrant—to search the house for illegal drugs, narcotics, drug-related paraphernalia, and other contraband illegally possessed. They executed this second warrant and seized the purported drugs and paraphernalia. They did not find tools which were identified as from River Products.

One of the occupants of the residence was William Christopher Corrado. The grand jury indicted him for possession of some of the marijuana seized in the search of the residence, and he moved to suppress that evidence. The magistrate held a hearing on the motion in the criminal case. Deputies Miller and Robert W. Carpenter testified; the defendant Corrado did not introduce any evidence. The magistrate then suppressed the evidence on the ground that the second warrant was founded on observations by the deputies in executing the first warrant, the first warrant was founded on observations by the deputies in the pickup truck, and the application for the first warrant contained a material misstatement: that the truck had expired Minnesota license plates. The magistrate did not find that the misstatement was intentional nor, on the record, do we. The magistrate further held that the State did not prove by clear and convincing evidence that Willard consented to the truck search.

The State petitioned this court for a writ of certiorari to test the magistrate's order. We granted a writ.

The certiorari proceeding before us involves five determinative issues. First, what is our scope of review? Second, who had the burden to prove misstatements in the application for the first warrant? Third, if Corrado had the burden, did he sustain it? Fourth, if Corrado established a misstatement, was the misstatement material? And fifth, did the application and abstract of testimony show probable cause to issue the first warrant?

I. *Scope of Review.* Corrado contended before the magistrate that the search of the River Street residence violated his constitutional right against unreasonable searches and seizures guaranteed by Amendment IV and § 1 of Amendment XIV to the United States Constitution. Therefore, Corrado contended, the evidence seized in the search is inadmissible under the exclusionary rule in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

■ In such situations we make an independent evaluation of the totality of the circumstances. *State v. Smethen,* 245 N.W.2d 308 (Iowa); *State v. Farrell,* 242 N.W.2d 327 (Iowa); *State v. Conner,* 241 N.W.2d 447 (Iowa); *State v. Cullison,* 227 N.W.2d 121 (Iowa) (independent evaluation of totality of circumstances—certiorari by State). If Corrado had lost on his motion before the magistrate, he certainly would be entitled to an independent evaluation here. Because of the gravity of the issues involved, we make an independent evaluation in the *class of cases* involving fundamental constitutional rights, such as searches and seizures, whichever party prevails on the issue in district court. *State v. Cullison,* supra.

II. *Burden of Proof.* Deputy Miller swore in his application for the first warrant that the truck had "expired Minnesota registration plates." He also swore in that application, "Driver of the vehicle (Willard) admitted owning vehicle and voluntarily gave consent for search of said vehicle." The magistrate issued the warrant.

Subsequently Corrado endeavored to show the two warrants were invalid because of intentional or material misstatements in the application for the first warrant. See *State v. Boyd,* 224 N.W.2d 609 (Iowa). The magistrate found Deputy Miller's statement that the truck had expired plates was a misstatement. He also held that the State had the burden of proving by clear and convincing evidence that Willard voluntarily consented to the truck search, that the State had not sustained its burden, and that the misstatement about the plates was therefore material as the foundation

for the stop and search of the truck. Consequently he held the warrants invalid and suppressed the evidence seized in the search of the residence.

■ The State would have had the burden of proving that Willard consented to the search of the truck if, for example, the State were prosecuting Willard for possession of the marijuana found in the search of the truck *without* a warrant and Willard were seeking to suppress the marijuana (assuming that the stop and search of the truck were otherwise unjustified). *State v. King*, 191 N.W.2d 650 (Iowa). But Deputy Miller made an application to a magistrate for a warrant to search the River Street residence, alleging inter alia under oath that Willard consented to search of the truck, and the magistrate issued a warrant. The officers then searched the residence *with* a warrant.

■ Who has the burden of proving the truth or falsity of sworn statements in an application for a search warrant? Originally an accused could not go behind the warrant at all in the absence of statute; the sworn statements in the application could not be controverted. 79 C.J.S. Searches & Seizures § 86 at 908. Subsequently some courts began to allow the accused to endeavor to establish the falsity of the statements, especially the federal courts. *United States v. Belculfine*, 508 F.2d 58, 60 (1 Cir.) ("a slow thaw in the rigidity of the rule which had long predominated among the circuit courts that judicial scrutiny of the propriety of the issuance of a warrant could not probe beneath the surface of the supporting affidavits"). Today the courts are divided although a majority of state courts apparently still hold the affidavit to be a verity. 68 Am.Jur.2d Searches & Seizures § 66 at 720. We collected a number of the decisions on both sides of the issue in *State v. Boyd*, 224 N.W.2d 609, 615–616 (Iowa). See also Anno. 5 A.L.R.2d 394, 396. We ourselves have adopted a rule allowing an accused to challenge the affidavit by showing it contains an intentional or material misstatement. *State v. Boyd*, supra.

In this setting, it is not surprising that courts which allow challenge of the affidavit do not hold that the filing of a motion to suppress itself nullifies the statements in the affidavit or hold that proof of one misstatement itself constitutes proof that other statements in the affidavit are untrue. Rather, the accused has the burden of proving the falsity of the statements he contends are untrue. On the burden of proof we stated in *State v. Boyd*, supra, 224 N.W.2d at 616:

> After a review of the various, and sometimes conflicting, conclusions of other courts, we now adopt a rule permitting a defendant to inquire into the truth of the representations upon which a search warrant has been issued only upon a preliminary showing under oath that an agent or representative of the state has: (1) intentionally made false or untrue statements or otherwise practiced fraud upon the magistrate; or (2) that a material statement made by such agent or representative is false, whether intentional or not.
>
> If *defendant* proves either of the above by a preponderance of the evidence, the search warrant shall be invalidated and the evidence seized thereunder shall be inadmissible. (Italics added.)

The California Supreme Court stated the principle thus in *Theodor v. Superior Court of Orange County*, 8 Cal.3d 77, 101, 104 Cal.Rptr. 226, 243, 501 P.2d 234, 251:

> Applying the general rule it is manifest that the defendant must carry the initial burden of demonstrating the inaccuracy or falsity of allegations set forth in the affidavit. A presumably reliable person has attested to the truth of the matters alleged in the affidavit and a magistrate has in the exercise of his impartial function determined that the affidavit was truthful and acted upon it. Thus the state has sustained its initial burden by virtue of the affidavit itself. If the defendant seeks to controvert the allega-

tions contained therein, it is his duty to come forth to reveal any inaccuracies.

New York law allows inquiry as to whether statements in an affidavit are perjurious. The New York Court of Appeals held "that the burden of proof is on the person attacking the warrant" and "that any fair doubt arising from the testimony at the suppression hearing as to whether the affidavit's allegations were perjurious should be resolved in favor of the warrant since those allegations have already been examined by a judicial officer in issuing the warrant." *People v. Alfinito*, 16 N.Y.2d 181, 186, 264 N.Y.S.2d 243, 246, 211 N.E.2d 644, 646. See also *United States v. Nepala*, 28 F.2d 898 (N.D.N.Y.); *United States v. Goodwin*, 1 F.2d 36 (S.D.Cal.); *State v. Baca*, 84 N.M. 513, 515, 505 P.2d 856, 858 ("Further, whatever the proper basis for an attack, the burden of proof is on the defendant.").

The cases on what constitutes a "material" misstatement also have a bearing here, for they demonstrate that proof of one misstatement does not constitute proof other statements in the affidavit are untrue—and the latter statements may render the misstatement immaterial. *State v. Baca*, 84 N.M. 513, 515, 505 P.2d 856, 858 ("All that defendant could have proved in this case was that he did not sell marijuana at the house that was searched. Removing that allegation from the affidavit, a showing of probable cause remains which has not been attacked. *Chin Kay v. United States* supra [311 F.2d 317 (9 Cir.)]. Thus even assuming the attack was permissible in this case, and that the attack was made on a proper basis, the attack was insufficient because it was not directed to allegations which, in themselves, were a sufficient showing of probable cause. The motion to suppress was properly denied."); *Davenport v. State*, 515 P.2d 377, 380 (Alaska) ("Furthermore, even after excising from the affidavit all of the alleged misstatements, we are satisfied that the affidavit was sufficient to support the search warrant."); *United States v. Mari-*

*hart*, 492 F.2d 897 (8 Cir.), cert. den. 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51; *United States v. Harwood*, 470 F.2d 322 (10 Cir.); *Theodor v. Superior Court of Orange County*, 8 Cal.3d 77, 104 Cal.Rptr. 226, 501 P.2d 234 n. 14; *State v. Lehman*, 8 Wash.App. 408, 506 P.2d 1316. See also *State v. Cassady*, 243 N.W.2d 581 (Iowa).

A case quite analogous to the present one is *United States v. Thomas*, 489 F.2d 664, 668 (5 Cir.), cert. den. 423 U.S. 844, 96 S.Ct. 79, 46 L.Ed.2d 64. In the present case the misstatement did not relate to the contents of the truck but to another fact, justification for stopping the truck (vis-a-vis a consent search of the truck, as the State urges). In *Thomas* the misstatement did not relate to the informer's information about the contents of the apartment but to another fact, use of a different name in the affidavit than the informer supplied. The accused's proof that the affiant used the wrong name did not nullify other facts stated in the affidavit, and those facts made the use of the wrong name immaterial. The court proceeded by "excising the misrepresentative parts from the affidavit. . . ."

■ We hold under *Boyd* and the other decisions cited that Corrado had the burden of proving the untruthfulness of the statements he attacked, that we will excise the statements he has proved by a preponderance of the evidence to be false, and that the remaining statements stand. The next question, therefore, relates to which statements if any he proved to be false.

III. *Misstatements?* Under our independent evaluation of the totality of the circumstances, we hold Corrado established as untrue by a preponderance of the evidence the statement that the license plates were expired, but we further hold that Corrado did not establish as untrue by a preponderance of the evidence the sworn statement in the application that Willard consented to the truck search. Indeed, al-

though defense counsel subsequently argued against consent, he stated at the outset of his argument before the magistrate, "With regard to the State's memorandum wherein they are resisting on the basis of consent, there may well have been a consent to search the truck," and again, "As to any evidence the State wishes to introduce as a result of the search of the truck, I would concede, probably, the fact that Mr. Willard probably gave consent."

IV. *Materiality of License Plate Misstatement.* Since Corrado did not establish the falsity of the consent statement in the application, the license plate misstatement loses its materiality; the consent itself rendered the truck search permissible. *State v. Smith*, 217 N.W.2d 633, 634 (Iowa) ("The State contends on three bases that the search of the car was lawful: Smith consented to the search, the officers had probable cause to search, and the articles were in plain view. We need go no further than the first basis urged by the State."); cf. *State v. Cassady*, 243 N.W.2d 581, 582 (Iowa) ("Furthermore a review of the record discloses none of the alleged misrepresentations was material. Disregarding them completely, we find the facts within the personal knowledge of the officers as communicated to the magistrate provided actual factual basis for the warrant to issue."). In division II we cited the decisions holding that materiality is determined by excising the misstatement and considering the statements remaining. We refer to those decisions here without repeating the citations. We hold that the statement about the license plates was not material.

V. *Probable Cause.* The grounds for the issuance of the warrant to search the River Street residence were the statements in and on the application for the warrant regarding the tools in the truck similar to those involved in the break-in of houses, regarding additional tools in the truck similar to those taken in the River Products break-in, regarding the tape play-

er taken in the latter break-in, and regarding the truck's tire imprints as matching those left at the River Products scene. The defense argues that the presence of the articles in and the tire imprints of the *truck* do not reasonably indicate that articles stolen at River Products would likely be found at Willard and Teterud's *residence.*

We have said that the test for issuing a search warrant "is whether a person of reasonable prudence would believe a crime was being committed on the premises to be searched or evidence of a crime was being concealed there." *State v. Bean*, 239 N.W.2d 556, 559–560 (Iowa). See also *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689. The Court stated in the latter case:

These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

We think the statements regarding the tools, the tire tracks, and especially the identified tape player, when taken with the listing of Willard and Teterud's residence as 320 River Street, constituted a reasonable basis for issuance of a warrant to search that residence. See *State v. Wright*, 244 N.W.2d 319 (Iowa) (items justified warrant

to search residence of suspected thieves); *United States v. Spearman*, 532 F.2d 132, 133 (9 Cir.) (searches upheld where "the nexus between the items to be seized and the place to be searched rested not on direct observation . . . but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property."); *Haefeli v. Chernoff*, 526 F.2d 1314, 1319 (1 Cir.) ("On the basis of the information in the affidavit it was reasonable to infer that when the officer arrested the suspects, he learned the address at which they lived, if he did not know it previously. It was also reasonable to infer, from their possession of Mona Lacey's identification material, that they had either stolen it themselves from the Lacey apartment or had received it from the thief knowing it to have been stolen, and that in either event the other articles stolen from the apartment might be found where they lived.").

The magistrate had probable cause to issue a warrant.

We do not reach the State's argument that Corrado lacks standing to challenge the legality of the search of the truck.

We hold that the magistrate should have overruled Corrado's motion to suppress.

WRIT SUSTAINED.