David Randall BETTUO, Plaintiff,

v.

The Honorable C. H. PELTON, as Judge of the District Court of Iowa in and for Scott County, Defendant.

William Donald FALBE, Plaintiff,

v.

The Honorable C. H. PELTON, as Judge of the District Court of Iowa in and for Scott County, Defendant.

No. 2–60124.

Supreme Court of Iowa.

Dec. 21, 1977.

Dennis D. Jasper, Bettendorf, for plaintiffs.

Richard C. Turner, Atty. Gen., Faison Sessoms, Asst. Atty. Gen., for defendant.

Heard by MOORE, C. J., and RAWLINGS, REES, UHLENHOPP and McCORMICK, JJ.

RAWLINGS, Justice.

Having been separately charged with manufacturing a controlled substance, both defendants (plaintiffs herein) unsuccessfully moved to suppress evidence found in their residence during a warrantless search to which one plaintiff's estranged wife had consented. Certiorari writs were here granted and cases consolidated for purpose of review. We sustain both writs.

Instantly disputed is a September 19, 1976, search of the residence at 2324 West 58th Street, in Davenport. Plaintiff William Donald Falbe (Falbe) and his wife, Oleta Jean Falbe (Jean), joint owners of the premises, were equally liable on a mortgage.

Falbe and Jean lived in the house until April 1976, when the latter moved out. Thereafter Jean lived elsewhere and Falbe occupied the residence. At time of the search a marriage dissolution proceeding was pending.

During the four months immediately preceding the search, Jean's brother, plaintiff David Randall Bettuo (Bettuo) and his wife were living in the house with Falbe. As stipulated below, Bettuo was paying rent to Falbe and his standing to challenge the search is not questioned.

The evening of September 19, 1976, Jean entered the house through the back door by use of a key. No one was home at the time. Apparently, while gathering some papers belonging to her, she allegedly discovered a marijuana "greenhouse" in the basement. Jean thereupon called the police, let the responding officers into the house, and showed them the marijuana which was promptly seized. Plaintiffs were arrested later that evening.

As aforesaid, Falbe and Bettuo were separately charged with manufacture of a controlled substance in violation of Section 204.401(1b), The Code 1975. Both moved to suppress all evidence gained by the seizure, the essential contention of each being that Jean had no search consent authority. These motions were overruled by defendant judge.

■ I. Because plaintiffs contend the consent-based search violated their constitutional rights our review is de novo, i. e., we independently evaluate the circumstances in totality. *State v. Iowa Dist. Ct. in and for Johnson Cty.,* 247 N.W.2d 241, 245 (Iowa 1976). This rule is applicable even though the case is before us on certiorari. See *State v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975).

II. A prefatory discussion of some relevant guiding principles is deemed appropriate.

■ The residence search was accomplished without a warrant. Therefore it must be deemed "per se unreasonable" unless shown to come within one of the "specifically established and well delineated exceptions". *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), quoted in *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *State v. Shane,* 255 N.W.2d 324, 326 (Iowa 1977). And such exception must be established by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177, n. 14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974), citing *Lego v. Twomey,* 404 U.S. 477, 488–489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). See also

*State v. Fetters,* 202 N.W.2d 84, 88 (Iowa 1972).

Here the State seeks shelter under what is commonly referred to as the "consent exception".

In this regard a "search of property, without warrant and without probable cause, but *with proper consent* voluntarily given, is valid under the Fourth Amendment." (emphasis supplied). *United States v. Matlock,* 415 U.S. at 165–166, 94 S.Ct. at 990. See also *Schneckloth v. Bustamonte,* 412 U.S. at 219, 93 S.Ct. at 2043–2044; *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–1792, 20 L.Ed.2d 797 (1968); *Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946); *Amos v. United States,* 255 U.S. 313, 317, 41 S.Ct. 266, 268, 65 L.Ed. 654 (1921); *State v. Knutson,* 234 N.W.2d 105, 107 (Iowa 1975); *State v. Ahern,* 227 N.W.2d 164, 165 (Iowa 1975).

■ Included within the term "proper", as used in *Matlock,* is a requirement that the consenting party have authority to so act. *Stoner v. California,* 376 U.S. 483, 489, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964).

III. Noticeably, plaintiffs do not dispute the voluntary nature of Jean's consent. Rather, they posit her acquiescence was not "proper" because she had no authority to consent.

On the other hand, defendant would justify intrusion upon permission of a person other than one subsequently accused, or "third-party consent". See generally *Matlock,* 415 U.S. at 169–171 & nn. 4–6, 94 S.Ct. at 992–993; *Schneckloth v. Bustamonte,* 412 U.S. at 245–246, 93 S.Ct. at 2057; *State v. Knutson,* 234 N.W.2d at 107; *State v. Ahern,* 227 N.W.2d at 165; Annot., 31 A.L. R.2d 1078.

In sum total, the determinative question is whether Jean "possessed *common authority* over or other sufficient relationship to the premises or effects sought to be inspected." (emphasis supplied). *Matlock,* 415 U.S. at 171, 94 S.Ct. at 993.

■ At the outset it is understood the above stated test cannot be satisfied by

simply proving Jean's joint ownership of the premises. As explained by the *Matlock* Court, 415 U.S. at 171, n. 7, 94 S.Ct. at 993, in language substantively adopted by us in *Knutson*, 234 N.W.2d at 107:

"Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, * * * but rests rather on *mutual use of the property by persons generally having joint access or control for most purposes,* so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (emphasis supplied).

■ Consequently Jean "possessed common authority" only if she, (1) had joint access to or control of the residence for most purposes, and (2) exercised such mutual use of the residence that plaintiffs assumed the risk of her consent. Cf. *United States v. Heisman,* 503 F.2d 1284 (8th Cir. 1974); *United States v. Cook,* 530 F.2d 145, 148–149 (7th Cir. 1976).

Focusing upon this amplification of the common authority criteria, the State contends Jean surrendered no marriage-related rights of equal access to and control of the premises by moving out and living elsewhere. It accordingly asserts plaintiffs' efforts to "wrongfully" exclude Jean from the home are presently inconsequential and plaintiffs therefore assumed all risk attendant upon Jean's possible exercise of her spousal rights. In adopting this stance the State leans heavily upon *United States v. Long,* 524 F.2d 660 (9th Cir. 1975).

But the factual situation in *Long* is clearly distinguishable from that presently involved. Mrs. Long was, in effect, forcibly ousted from her home absent a knowing relinquishment of any common authority. Under those circumstances the court held Mrs. Long could effectively consent to a search of the marital residence within a few days after her compelled retreat therefrom.

On the other hand there is presently no evidence which establishes Jean's "wrongful" exclusion from the Falbe home. Rather it appears the Falbes decided not to cohabit and Jean voluntarily surrendered the residence to her husband. Furthermore, the involved search occurred about six months after Jean had so vacated and removed most of her possessions from the premises.

In any event, this court is not persuaded *Long* manifests a per se rule to be applied in all estranged-spouse consent situations. Rather an examination of the facts in each case under the *Matlock* test is deemed more appropriate. Cf. *Schneckloth v. Bustamonte,* 412 U.S. at 226–227, 93 S.Ct. at 2047; *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966).

■ IV. Guided by *Matlock,* we attach minimal significance to Jean's joint property interest in the residence. Unquestionably, she and Falbe had orally agreed, in connection with the marriage dissolution proceedings, he was to get the house and she would keep the couple's new car.

Moreover, their post-separation behavior was consistent with that agreement, i. e., the Bettuos moved in; they paid rent to Falbe; Jean contributed nothing toward mortgage payments. Further in this regard, plaintiffs were neither aware Jean had retained her back door key, nor did she use it after the Bettuos moved in until the night of the search.

Finally in this vein, *United States v. Heisman,* 503 F.2d 1284 (8th Cir. 1974), comes into play as persuasive authority. There the Court held that where Heisman's commercial building co-tenant (Kesterson) had no access right or control of the former's room Kesterson could not give a valid third-party consent to a search of Heisman's quarters notwithstanding the co-tenant's equal "right" to use of an area in which Heisman stored his work product. The true significance thereof becomes apparent only when viewed in the context of this rationale, 503 F.2d at 1288–1289:

"In the case *sub judice* Kesterson had a property interest in the searched area because he was a co-lessee. The question we must decide, however, is whether he had the requisite 'joint access or control for most purposes' over the property. [cited is *Matlock,* 415 U.S. at 171, n. 7, 94 S.Ct. at 993, heretofore quoted]. We conclude that he did not. Although there was no door or lock to Heisman's room, it was nevertheless an area set aside for his own private use. Kesterson had only been in the room once and then with Heisman's permission. As a practical matter, Kesterson did not have access or control of Heisman's room for *any* purpose. Kesterson and Heisman were co-tenants in a building in which there were both common areas of use and private areas for each to run his separate business. In short, Kesterson had a legal but not a possessory right to the area in which Heisman stored his work product. Thus, Kesterson could not legally consent to a search of that area.

"At the hearing on defendants' motions to suppress evidence obtained as a result of the search, Kesterson testified that at the time of the agents' request to search he 'assumed it was all right' for the agents to search Heisman's room. This was in response to a question asking whether Kesterson 'assumed . . . [he] had access to [Heisman's room].' We do not find layman Kesterson's state of mind on this legal question at the time of the request to be controlling. Whether Kesterson had the requisite 'joint access or control for most purposes' must be determined objectively from the facts. Other than Kesterson's subjective thoughts on this matter, there is no evidence that he had control of or access to Heisman's room for most purposes."

Confining ourselves to the objective approach it is to us evident Oleta Jean Falbe had a property interest in the involved premises but, as a practical matter, had neither a reasonable expectation of mutual usage thereof nor requisite access to or control of the residence for most purposes. Therefore, Mrs. Falbe possessed no common authority over the premises upon which she could properly consent to a search thereof.

This means the involved warrantless search was unreasonable and violated the Fourth Amendment rights of both plaintiffs. Consequently trial court exceeded its jurisdiction or otherwise acted illegally in denying their respective suppression motions.

BOTH WRITS SUSTAINED.