**STATE of Iowa, Appellant,**

v.

**Monte Wendell SEAGER, Appellee.**

No. 68535.

Supreme Court of Iowa.

Nov. 23, 1983.

**422**

Thomas J. Miller, Atty. Gen., Michael Jordan, Asst. Atty. Gen., and Michael Riepe, County Atty., for appellant.

John W. Logan and Frank J. Nidey, Cedar Rapids, for appellee.

Considered by REYNOLDSON, C.J., and McCORMICK, SCHULTZ, CARTER and WOLLE, JJ.

CARTER, Justice.

The State has made application for, and has been granted, permission to pursue by discretionary review an appeal seeking relief from two pretrial rulings of the district court in this criminal case. Both of the rulings for which review has been sought involve the suppression of evidence which the State wishes to offer at the trial of the criminal action.

On August 10, 1981, the defendant, Monte Wendell Seager, was charged by indictment with murder in the first degree in the deaths of Clementine Ann Beavers and Karol Elizabeth Beavers, both of whom were found shot to death in their home in Mount Pleasant, Iowa, on October 29, 1978. Several months after his indictment, defendant filed two separate motions to suppress evidence. The first of these motions sought the suppression of all testimony from two prospective witnesses, Sharon Gaylord and Max Beavers. The motion was predicated upon the contention that both of these witnesses, at the behest of the State, had undergone hypnosis in an effort to enhance their memories of events material to the pending homicide investigation. The defendant asserts in his motion to suppress that the effect of such hypnosis renders their prospective testimony so inherently unreliable that its admission would deprive him of a fair trial.

At the hearing on this motion, defendant presented the testimony of Dr. Martin T. Orne, a recognized expert in the field of hypnosis. Dr. Orne testified generally that hypnosis is not a reliable or scientifically accepted means of generating accurate recall on the part of a subject. In addition, he testified that as to matters which have been recalled by a witness prior to hypnosis, the hypnotic process thereafter warps the witness's perception of what really occurred by creating "pseudo memories."

Partially in response to the testimony of the defendant's expert, the State offered the deposition of D. Eric Elster, the hypnotist who had sought to enhance the memories of Sharon Gaylord and Max Beavers. This witness gave his views on the reliability of hypnosis. He indicated the extent of such reliability is directly dependent upon the opportunity for external corroboration of the information gleaned from the subject under hypnosis. He did not testify concerning the dangers of "pseudo memories" resulting from the hypnotic process.

On this record, the district court found that as a result of the continuing effects of hypnosis on their memories, the reliability of the testimony expected from these two witnesses was sufficiently suspect that they should not be permitted to testify at the trial with respect to the subject matter of the pending criminal prosecution or any issue therein. Other facts relevant to the court's ruling on this issue are discussed in connection with the legal issue which we hereafter consider.

The second motion to suppress involved in the present appeal relates to evidence seized during the execution of a search warrant at the residence where defendant resided with his father and stepmother. Defendant's motion to suppress evidence obtained during this search and the fruits thereof was granted by the trial court on the ground that the affidavit presented in support of the search warrant had contained intentionally false statements. The facts surrounding the application for the search warrant, the testimony given at the suppression hearing with respect to the source and accuracy of said information, and other matters bearing on the issue are more fully developed in our discussion of the legal issues which have been presented by the State's appeal of that issue.

We separately consider the district court rulings on the two suppression-of-evidence issues. The issue relating to the search and seizure will be considered first.

I. *The Search and Seizure Issue.*

The trial court granted defendant's motion to suppress all items seized by law enforcement officers from the Seager residence and surrounding premises on July 26, 1979. Also ordered suppressed were the fruits of such search to the extent that

additional information was obtained as a result of the evidence seized at the Seager residence. At the time of the search, however, defendant was in jail awaiting trial on another homicide. While defendant was in jail and prior to the issuance of the search warrant, a request by law officers that defendant's father or stepmother voluntarily produce a rifle belonging to defendant was refused. A search warrant for the premises was then obtained and the search in question conducted. The rifle in question was found and seized.

Among the several grounds advanced in the motion to suppress this evidence was the claim that the affidavit offered in support of the State's application for the warrant contained "intentional false or untrue statements." At the hearing on the suppression motion, this claim focused on the following statement contained in the affidavit of August Hagers, an officer of the Mt. Pleasant Police Department:

During the April 16th 1979 search of the 501 S. Jefferson residence [the Seager residence], sheriff Droz observed a locket in a metal box in the upstairs bedroom similar to the one believed missing in the Beavers homicide case.

The earlier search referred to was related to the other homicide investigation in which defendant was suspected.

The quoted statement is the last paragraph contained in the affidavit in support of the warrant application. While the rest of the affidavit is typed, that paragraph is handwritten. It was the testimony of Officer Hagers at the suppression hearing that the affidavit was supplemented by adding this paragraph at the time he appeared before a district judge seeking issuance of the warrant.

When questioned about the source of the information concerning Sheriff Droz' observations of the locket, Hagers testified that while he and agent Goepel of the Division of Criminal Investigation were preparing the warrant application, the sheriff briefly entered the room and asked if a locket was missing in the Beavers investigation. The sheriff then stated that in a search of the Seager premises in connection with another homicide investigation he had discovered a metal box which contained a heart-shaped locket.

Hagers testified at the suppression hearing that he had been present during the previous search when the box had been discovered by the sheriff and had viewed the contents of the box at that time. Hagers did not recall seeing a locket in the box. Agent Goepel testified at the suppression hearing that he was aware of a missing locket in connection with the Beavers' homicides. He vaguely recalled that Sheriff Droz came into the room while he and Hagers were preparing the warrant application. He could not, however, recall the substance of the conversation which took place at that time.

Sheriff Droz testified as follows at the suppression hearing:

Q. Were you at that time or from then on or up until this year aware that any other authorities, and I'm talking about police department, DCI were, in fact, looking for a locket in connection with the Beavers' homicide?

A. Not that I can recall at all, no, sir.

Q. Can you recall them ever giving you a description of a locket for which they were looking?

A. No, sir.

Q. Can you ever recall telling any other law enforcement authorities that you had observed a locket on April 16th, 1979, during the search?

A. No, sir.

Sheriff Droz testified that the first he had learned about the fact that a locket was missing in the Beavers' homicide or that he was claimed to have noticed a similar locket at the Seager residence was when defendant's counsel informed him of these claims prior to his testifying at the suppression hearing.

Based on this evidence, the trial court found that Hagers' statement in the affidavit concerning the sheriff finding the locket was deliberately false. The court invalida-

ted the warrant and ordered suppression of items seized pursuant thereto, together with any fruits of the search.

The trial court's order suppressing this evidence was based upon its belief that this was required by our holding in *State v. Boyd,* 224 N.W.2d 609, 616 (Iowa 1974). *Boyd* involved our interpretation of the proper procedures to be employed in challenging the accuracy of search warrant applications under both the federal and state constitutions. In the case of *State v. Groff,* 323 N.W.2d 204, 206–08 (Iowa 1982), decided after this appeal was taken and after the appellant filed its brief, we recognized that our determination in *Boyd* was contrary to the current interpretation of the federal constitution in *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667, 672 (1978), decided four years after *Boyd.* In *Groff,* we decided that the procedures approved by the Supreme Court in *Franks* should be applied in determining challenges to search warrant applications under both the federal and state constitutions.

We believe the *Franks* standards should be applied in determining the validity of the search warrant in the present case even though not expressly argued in the State's brief. That brief was also filed before our decision in *Groff* which rejected the prior *Boyd* standards. In addition, we are influenced by the fact that this is an appeal in advance of final judgment. One of the purposes of granting such appeals is to assure that the case is determined under correct legal standards in the trial court. For this reason, we avail ourselves of the opportunity to secure a determination of these important issues according to the legal standards currently in force.

The *Franks* standards will have two significant effects on the issue presented. First, under *Franks,* intentionally false statements and false statements made with a reckless disregard for the truth are treat-

ed the same. We therefore need not consider whether the evidence sustained the trial court's finding that the challenged statement in the Hagers' affidavit was deliberately false; if the evidence fails to show that it was, we find that it nevertheless clearly shows that the statement was made with a reckless disregard for the truth. Second, under the *Franks* standards, the remedy for both intentionally false statements and false statements made with a reckless disregard for the truth is not to invalidate the warrant. Rather, the *Franks* standards provide that the false statement should be excised from the affidavit and that the presence of probable cause be redetermined based upon that which remains.

The trial court in the present case never determined whether the warrant application was supported by a showing of probable cause in the absence of the challenged statement concerning Sheriff Droz' discovery of the locket at the Seager residence.[1] We have previously quoted the portion of the affidavit which must be excised. In the absence of that information, the remainder of the affidavit reads as follows:

That Karol and Clementine Beavers, 509 S. Locust, Mt. Pleasant, Iowa, were found dead at their residence by Max Beavers, father and husband to the deceased in the early morning hours after 1:00 AM on 10/30/78. Investigation by Police and medical authorities who were notified at 1:42 AM on 10/30/78, revealed that the victims had been shot to death with 22 caliber CCI ammunition and that Karol Beavers, age 17, had been sexually molested in close proximity to death and was found partially clad. The investigation of the two homicides is still open and no arrests have been made. Monte Seager, age 18, of 501 S. Jefferson St., Mt. Pleasant, Iowa, is under arrest in connection with the homicide of

1. In making the determination that the Hagers' affidavit was sufficient to establish probable cause for the warrant to issue the trial court did assume, arguendo, that certain information should not be considered. A careful reading of the ruling in its entirety, however, leaves no doubt that the Droz' statement was considered in making the probable cause determination.

Susan Wheelock, age 32, who died April 17th 1979 after suffering a severe beating. The assault took place in the early morning hours of April 14, 1979 at the Iris Restaurant, Highway 34 West, Mt. Pleasant, Iowa.

Investigation of the Beavers homicide revealed that Monte Seager was living at 501 S. Jefferson St., Mt. Pleasant, Iowa on October 29, 1978 and that he was employed at the Iris Restaurant. This information was obtained from him in an interview conducted on November 2, 1978 at 8:30 PM by BCI agents and Mt. Pleasant Police. Seager advised he did own a 22 caliber rifle. Seager further stated that he was home the night of October 29th, 1978. His stepmother, Sharon Gaylord could only verify that he was at home at 10:00 PM on October 29, 1978. She did not see him after he went to bed. She left for work at 10:40 PM. The Seager residence is only three-tenths (³/₁₀) of a mile from the Beavers residence.

The Mt. Pleasant High School records indicate that Monte Seager and Karol Beavers were in the same speech class in October of 1978.

While executing a search warrant at 501 S. Jefferson in regard to the Wheelock homicide on April 16, 1979, a 22 caliber Mossberg rifle was observed disassembled and in a suitcase also containing the clothes of Monte Seager. Monte's father, Harry Seager, advised that the weapon belonged to Monte. This was also confirmed by Sharon Gaylord. Officers further observed a plastic box containing CCI 22 caliber ammunition.

Juvenile authorities advised investigating officers that Monte Seager has had a prior history of delinquency and that he has been a patient at the Mental Health Institute in Mt. Pleasant.

A locket belonging to Karol Beavers, silver in color with a heart and flower design, on an 18 to 20 inch chain is missing and presumed taken at the time of her murder.

BCI lab technicians observed a belt buckle type impression in blood on the shirt of Karol Beavers that was possibly made by a large western type buckle with a word or words on the buckle. Fran Worth, an employee of the Iris Restaurant and co-worker of Monte Seager can recall Monte wearing a gold belt buckle within the last month.

On November 21, 1978, FBI crime scene experts, John Douglas and Jim Resser examined photographs and evidence from the homicides and compiled a profile giving a statistical description of the perpetrator of the Beavers homicides. Monte Seager fits 12 of the 20 characteristics described by the FBI agents.

On July 26, 1979, the officer went to the residence of 501 S. Jefferson, at this residence is one 22 caliber Mossberg rifle-serial # 971790, model # 640 KD. This said above rifle is still at the above residence.

██ It is well-established that we may consider only the information contained in the foregoing affidavit in determining whether probable cause was shown for the warrant to issue. *State v. McManus*, 243 N.W.2d 575, 577 (Iowa 1976); *State v. Easter*, 241 N.W.2d 885, 886 (Iowa 1976); *State v. Liesche*, 228 N.W.2d 44, 48 (Iowa 1975). We may not consider other relevant information in the record which was not presented to the magistrate. As stated in 1 LaFave, *Search and Seizure* section 3.1, at 447–48 (1978):

[T]he probable cause determination in response to the motion to suppress must be made upon the basis of the information which was presented to the magistrate at the time the warrant was issued; a defective warrant cannot be resuscitated by consideration of additional information now available or even of information available when the warrant was obtained but which was not communicated to the magistrate.

██ In determining whether probable cause has been established for the issuance of a search warrant, the test is whether a person of reasonable prudence would be-

lieve a crime was being committed on the premises to be searched or evidence of a crime could be located there. *State v. Post,* 286 N.W.2d 195, 199 (Iowa 1979); *State v. Iowa District Court,* 247 N.W.2d 241, 245 (Iowa 1976); *State v. Bean,* 239 N.W.2d 556, 559–60 (Iowa 1976). The quantum of proof or probability determination which is required to satisfy the fourth amendment is not a variable one depending on multifarious circumstances. As stated in *Dunaway v. New York,* 442 U.S. 200, 214–15, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824, 836 (1979):

> A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.

Probable cause to search, in contrast to probable cause to arrest, requires a probability determination as to the nexus between criminal activity, the things to be seized, and the place to be searched. In the present case, the Hagers' affidavit establishes probable cause to believe that a crime was committed and probable cause to believe that the items sought to be seized, *i.e.,* a gun and ammunition, were located at the premises sought to be searched. The problem lies in the sufficiency of the nexus between the items to be seized and the established criminal activity. As stated in 1 LaFave, section 3.7 at 704–05:

> [E]ven if there is probable cause—or even absolute certainty—that certain described items are presently to be found in a certain described place, a lawful basis for search has not been established unless it is also shown to be probable that those items constitute the fruits, instrumentalities, or evidence of crime. In the absence of such a showing, the described items are not a legitimate object of a search....
>
> Mere suspicion that the objects in question are connected with criminal activity will not suffice.

The averments of the affidavit seek to connect the .22 caliber Mossberg rifle and the box CCI .22 caliber ammunition to the Beavers' homicides in two ways, the similarity of the type and caliber of the ammunition used in the Beavers' shootings, and the suggestion that the possessor of the rifle and ammunition, defendant Monte Seager, was a perpetrator of the Beavers' murders. We conclude that either singly or in combination the averments of the affidavit, stripped of the paragraph which has been excised, are insufficient to establish probable cause for the issuance of the warrant.

The similarity in the type and caliber of the ammunition to that involved in the murders does not suggest any measurable degree of probability that the defendant's rifle was the murder weapon. The designation "CCI" used in the affidavit to describe the shells would be significant only if it identified an unusually rare type of ammunition. There is nothing in the affidavit to suggest that this is so, and, if it were so, this would probably not have been known to the magistrate. The issue is similar to that involved in *State v. Jackson,* 380 So.2d 616, 620 (La.1980) where the court concluded:

> The affidavit offered the magistrate no grounds upon which he could reasonably have concluded that the defendant's gun was probably connected with the airport shooting and therefore evidence of a crime.... [S]uspicions may be raised by the possession of a shotgun of a common guage and shells bearing a major national brand name, loaded with a common size of shot, but "the suspicions aroused are far outweighed by the possibilities of innocent behavior, considering all of the circumstances."

With respect to the suggested nexus between the defendant and the Beavers' killings, the facts stated in the affidavit at best create some suspicion that his activities should be investigated. This is a far cry from probable cause. As stated in *Henry v. United States,* 361 U.S. 98, 101, 80 S.Ct. 168, 170, 4 L.Ed.2d 134, 138 (1959), "common rumor or report, suspicion, or

even 'strong reason to suspect' was not adequate to support a warrant..."

■ Although defendant's arrest for a subsequent homicide is a matter which may be considered on the issue of probable cause, there is no showing that the later crime bears sufficient similarity in its manner of execution to give rise to a reasonable inference that the same person committed both acts. *See Commonwealth v. Gullett,* 459 Pa. 431, 434, 329 A.2d 513, 515 (1974); *State v. Hicks,* 515 S.W.2d 518, 521–23 (Mo.1974). Although we base our decision on a different reason, we believe the trial court was correct in ordering the suppression of the evidence seized from the Seager residence pursuant to a search warrant issued on the strength of the Hagers' affidavit and the fruits of that search. The trial court is therefore affirmed on the search and seizure issue.

II. *Admissibility of Testimony from Witnesses Who Have Been Hypnotized in Order to Induce Recollection.*

We next consider the State's claim that the trial court erred in ordering suppression of all testimony of the witnesses Max Beavers and Sharon Gaylord on the ground that they have been subjected to hypnosis for purposes of inducing recollection of events relevant to the Beavers' homicide investigation. The trial court's order suppressing the testimony of these witnesses was based upon findings as to the effect of hypnosis upon the ability of witnesses to thereafter testify from independent recollection. In this regard, said findings were for the most part based on the testimony of the defendant's expert witness, Dr. Orne, as to the potential effects of hypnotism upon actual recollection.

Dr. Orne testified with respect to the effects of hypnosis in two respects: (1) as a useful technique in memory enhancement and (2) as it affects the ability of witnesses to thereafter testify based upon actual as opposed to supposed recall of events. He testified that the use of hypnosis to induce memory recall was of questionable effec-

tiveness for that purpose. He further testified that an expected result of using the hypnotic technique for this purpose is that the witness will thereafter be left with a "pseudo memory" of the event. A necessary consequence of that condition will be that thereafter the witness in describing the event will be testifying from the "pseudo memory" rather than from an actual memory. He opined that because hypnosis is capable of producing this effect on a witness and because there is no reliable method of distinguishing such "pseudo memory" from accurate memory, any testimony of the witness concerning events discussed under hypnosis is unreliable.

Although hypnotically influenced testimony was tangentially involved in our decisions in *Lawson v. State,* 280 N.W.2d 400 (Iowa 1979) and *State v. Thompson,* 326 N.W.2d 335 (Iowa 1982), we have never directly considered the question of whether witnesses who have been hypnotized for purposes of probing their recollection of certain events may thereafter be permitted to testify concerning that recollection.

Courts from other jurisdictions which have considered this problem have reached differing results concerning the admissibility of testimony of witnesses who have been subjected to hypnosis prior to testifying.

Several courts have simply ruled that the effects of hypnosis is a matter which goes to the weight to be accorded a witness's testimony but not its admissibility. *United States v. Awkard,* 597 F.2d 667, 669 (9th Cir.), *cert denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Adams,* 581 F.2d 193, 198 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Clark v. Florida,* 379 So.2d 372, 375 (Fla.Dist.Ct.App.1979); *Creamer v. State,* 232 Ga. 136, 137–38, 205 S.E.2d 240, 241–42 (1974); *State v. Beachum,* 97 N.M. 682, 689, 643 P.2d 246, 253 (N.M.App.1982); *State v. McQueen,* 295 N.C. 96, 119–22, 244 S.E.2d 414, 427–29 (1978); *State v. Glebock,* 616 S.W.2d 897, 903 (Tenn.Cr.App.1981); *Chapman v. State,* 638 P.2d 1280, 1284 (Wyo.1982).

Other courts have adopted rules which exclude all testimony of a witness who has been hypnotized with respect to the subjects inquired into under hypnosis. *People v. Shirley*, 31 Cal.3d 18, 51–54, 641 P.2d 775, 794–96, 181 Cal.Rptr. 243, 263–65 (1982); *State v. Palmer*, 210 Neb. 206, 218, 313 N.W.2d 648, 655 (1981); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 110, 436 A.2d 170, 177 (1981).

At least one court has held that witnesses who have been hypnotized may not thereafter testify as to the subject matter involved unless certain established procedural safeguards are satisfied. *State v. Hurd*, 86 N.J. 525, 543, 432 A.2d 86, 95 (1981).[2] The court held that if these procedural safeguards are complied with the testimony of witnesses who had been hypnotized is admissible if the court also finds that the testimony is reasonably comparable to that which would be produced by the witness's normal memory.

Some courts have held that while the testimony of witnesses previously subjected to hypnosis is unreliable as to matters which those witnesses had not previously disclosed, testimony concerning facts disclosed by the witnesses prior to hypnosis is admissible. *State v. Collins*, 296 Md. 670, 701, 464 A.2d 1028, 1044 (1983); *State v. Koehler*, 312 N.W.2d 108 (Minn.1981). In *State v. Mena*, 128 Ariz. 226, 231, 624 P.2d 1274, 1280 (1981), the Arizona Supreme Court initially adopted a rule of per se inadmissibility, but subsequently modified its position to allow a witness to testify to facts which were demonstrably recalled prior to hypnosis. *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 209, 644 P.2d 1266, 1295 (1982).

Some courts have adopted an ad hoc approach placing the burden on the state in each individual case to satisfy the trial court that the testimony of witnesses previously subjected to hypnotism is reliable.

*People v. Hughes*, 59 N.Y.2d 523, 545, 453 N.E.2d 484, 495, 466 N.Y.S.2d 255, 266–68 (1983); *State v. Armstrong*, 110 Wis.2d 555, 571–72, 329 N.W.2d 386, 394 (1982).

The foregoing cases are less than all of the decided cases in the field and are cited as examples of the various approaches which have been taken to the problem presented in the present case. A more exhaustive collection of cases, categorized as to jurisdiction, together with discussion of each is contained in Note, 32 Drake Law Review 749 (1983).

Although some courts have treated the issue as though it concerns the reliability of use of a scientific procedure as evidence, we believe such a characterization is inaccurate. It is at least inaccurate for purposes of resolving the issues in the present case.

The two witnesses whose testimony is at issue in the present case made numerous statements to the police prior to the hypnotic sessions. In these prehypnotic statements, they related facts material to the homicide investigation which were based upon their memories of events which they had observed.

The defendant's motion to suppress was not aimed at any specific area of expected testimony of these witnesses claimed to have been the product of a hypnotically restored memory. As a result, nothing presented to the trial court or to this court has created any basis to suspect that the two witnesses will testify to any matters which had not been recalled and described to authorities prior to the hypnotic sessions. The State asserts that the witnesses will not be called upon to testify as to any matters not recalled prior to being hypnotized. It further asserts that the State will make no claim that their testimony is in any way enhanced as a result of having undergone hypnosis.

**2.** The *Hurd* safeguards include: (1) the hypnotic procedure must be conducted by an impartial professional; (2) a record must be made of all factual information supplied to the hypnotist; (3) without the use of leading questions, the hypnotist, prior to hypnosis, should obtain a recorded version of the subjects recall of material events; (4) all interaction between the subject and the hypnotist should be recorded, preferably on video tape; (5) only the hypnotist and the subject shall be present during any phase of the session.

The probity of the testimony of these witnesses will therefore be facially dependent not upon the accuracy of any scientific procedure, but upon the extent to which they may now accurately relate their own recollection of personal observations. In apparent recognition of this circumstance, the trial court's ruling suppressing their testimony is not based upon rejection of a scientific principle, the acceptance of which is required to sustain the proffered evidence. Rather, that ruling is based on the court's acceptance of expert testimony indicating that the witnesses' prior recollections of personal observations is now tainted.

However convincing the expert testimony may be, we find few if any examples in our jurisprudence other than statutory declarations of incompetency and those few decisions in other cases involving hypnotism, which permit a court to exclude a witness's testimony from a trial as unreliable where the witness personally attests under oath that such testimony is based on recall of events which were personally observed.

The challenge to admissibility which is involved in these situations bears much similarity to that which we described in *State v. Harvey*, 242 N.W.2d 330, 335 (Iowa 1976) as "organic incapacity" affecting a witness's power of recollection. The traditional approach of the courts in such situations has been described as follows:

> It is only when no reasonable trier of fact could believe that the witness perceived what he claims to have perceived that the court may reject the testimony. Not improbability but impossibility is the test.

E. Morgan, *Basic Problems of Evidence* 59–60 (1963). While the present case may involve a special application of witness competency which requires a different standard, there are practical considerations which militate against making such standard overly restrictive.

As stated in *People v. Hughes*, 59 N.Y.2d 523, 535, 453 N.E.2d 484, 495, 466 N.Y.S.2d 255, 266 (1983):

> As indicated, hypnosis has proven to be a useful and apparently essential investigative tool for generating leads in cases where normal police procedures have proven inadequate, although its use to confirm police suspicions, or prepare a witness for trial is more dubious and is not to be encouraged. It also appears that hypnosis has become a fairly standard course of medical treatment for amnesia resulting from traumatic events, including witnessing or being victimized by a criminal act. A criminal trial ... would present an odd spectacle if the victim was barred from saying anything, including the fact that the crime occurred, simply because he or she submitted to hypnosis sometime prior to trial to aid the investigation or obtain needed medical treatment. Even in cases dealing with the frailties of eyewitness identification some allowance must be made for practicalities....

(Footnote omitted). Similar considerations apply to material witnesses other than the victim. Particularly where, as in the present case, the victims are dead.

Dr. Orne's trial testimony reiterated the views he has expressed in Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. Clinical & Experimental Hypnosis 311 (1979) and Orne, *Hypnotism, Suggestibility and the Law*, 31 Neb.L.Rev. 575 (1952). These views are shared by another leading expert in the field, Dr. Bernard Diamond, author of Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif.L.Rev. 313 (1980). These experts opt for a prophylactic rule because there is a potential for hypnosis to produce "pseudo-memory" which thereafter renders a witness's testimony unreliable, and there is no scientific method for detecting when and to what extent this has occurred.[3]

---

**3.** In support of the contention that there is no scientific means of measuring such taint, *see Resolution of the Executive Council of the Socie-* *ty for Clinical and Experimental Hypnosis*, 27 Int'l J. Clinical & Experimental Hypnosis 452 (1979).

The expert testimony of Dr. Orne, upon which the trial court's ruling relies, is prophylactic in tone. It seeks to prevent the evils of undue suggestiveness and confabulation which might taint the testimony of some witnesses who have been hypnotized by excluding the testimony of all witnesses who have been hypnotized. We conclude that this approach will often have the effect of throwing the baby out with the bath water.

Dr. Orne in his testimony at the suppression hearing suggested that objective external verification of a witness's testimony is the only means of assuring its reliability following hypnosis. Although at least one court in *People v. Smrekar*, 68 Ill.App.3d 379, 388, 24 Ill.Dec. 707, 714, 385 N.E.2d 848, 855 (1979) has suggested that objective external verification be utilized as a test for the admissibility of hypnotically influenced testimony, we reject this conclusion because we conclude it runs counter to the well-established principle that reliability of a witness's testimony is not a measure of its admissibility. Consistent with that principle the vice which we should guard against is not departure of the witness's testimony from "the true facts" which may never be ascertained with absolute certainty, but rather the departure of the testimony from that which would have been provided by the witness's memory uninfluenced by the hypnotic process.

We conclude that if the trial testimony of the witnesses Sharon Gaylord and Max Beavers is substantially the same as that provided in statements to the police and others prior to their being hypnotized, as the State claims it will be, such testimony should be deemed admissible. The State should be given an opportunity upon remand to demonstrate to the trial court's satisfaction that this will be so. Procedures for limiting the matters testified to by these witnesses may be developed by the trial court as a result of that showing. Because we cannot possibly envision all possible situations in which recollections of the witnesses prior to hypnosis might be demonstrated to accord with their posthyp-

notic testimony, we will not attempt to lay down conditions for demonstrating such similarity. Such effort on our part would risk omission of other acceptable solutions which do not occur to us. We emphasize, however, that the posthypnotic testimony is to be measured against the witness's own recollections gleaned prior to hypnosis and not against other objective indicia of the facts which are the subject of the testimony.

The record in the present case includes posthypnotic testimony of the witnesses Sharon Gaylord and Max Beavers in depositions taken by counsel for the defendant. Whether their trial testimony will relate to matters which were not inquired about in these depositions, we do not know. The minutes of testimony do not suggest that it will. To the extent the record shows relevant information related by these witnesses concerning the Beavers' homicides, we find no discernible difference between facts related prior to the hypnotic sessions in statements to the police and before the grand jury, in facts related in the depositions taken after the hypnotic session.

The testimony of defendant's expert witness, Dr. Orne, indicated only that perhaps Sharon Gaylord was more certain of her testimony on certain matters after hypnosis than before. Based on those principles of practicality and necessity which we have previously alluded to, we do not believe that differences in degrees of certainty should prevent a finding that the testimony is reasonably comparable to that which would be produced by the witness's memory uninfluenced by hypnosis. We note, moreover, that the conclusions of Dr. Orne were based on statements of Sharon Gaylord made during the hypnotic session rather than matters stated by her after that process was terminated. He conceded that at her deposition taken after the hypnotic session, this degree of certainty had subsided somewhat. He testified "there is no way of knowing" the effect of the hypnosis at the present time.

■ The State shall not be permitted to offer evidence at trial tending to enhance the probity of the testimony of these witnesses due to the effects of hypnosis. The defendant, if he chooses to do so, should be permitted to offer qualified opinion evidence at trial, if available, which would detract from the probity of this testimony as a result of the effects of hypnosis. Such opinion evidence should be limited to the effects of hypnosis generally and not go to the truth or falsity of specific testimony.

■ Defendant urges that the potential for enhanced certainty on the part of these witnesses violates his constitutional right of confrontation by means of effective cross-examination. He further claims that this circumstance serves, in addition, to deny the effective assistance of counsel. We believe that the policy underlying the admissibility of this type of testimony must be judged in light of the totality of the truth-finding process and not just one aspect of it. Because we find admissibility to be desirable within this totality, the defendant must take his witnesses as he finds them for purposes of cross-examination.

*See State v. Armstrong,* 110 Wis.2d 555, 569–70, 329 N.W.2d 386, 394 (1982).

The order of the trial court suppressing the testimony of Sharon Gaylord and Max Beavers is reversed. The issue is remanded to the trial court for further proceedings concerning the admissibility of their testimony in accordance with the standards adopted in this opinion. The order of the trial court suppressing the evidence seized in the search of the Seager residence on July 26, 1979 is affirmed, as is the portion of that order suppressing the fruits of such search to the extent that additional information was obtained as a result of the evidence seized. Nothing in that ruling shall prevent the State from offering evidence concerning knowledge of the items seized which was in their possession prior to the illegal search and seizure.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.