## T. T. ATTAWAY V. THE STATE.

### No. 1963. Decided January 17, 1900.

**1. Murder of Witness—Evidence—Statements of Deceased Witness as to What He Would Testify.**

On a trial for murder, where the motive as claimed by the State was that deceased was a witness against defendant in a case for cattle-theft, it was error to admit in evidence the statements of deceased to the district attorney as to what he would testify in the said theft case, the defendant not being present when the statements were made, and it not being shown that he had any knowledge of the nature and character of deceased's testimony against him, or that deceased had told the district attorney what his evidence would be. And the fact that defendant was compelled to rebut such illegal testimony did not cure the error in its admission.

**2. Improper Argument—Practice.**

Where the district attorney in his closing argument makes a statement as to matters not in evidence, it is the duty of the court to promptly exclude such statements and admonish the attorney to keep within the record.

**3. Manslaughter—Charge of Court.**

Upon a trial for manslaughter it is error for the court in its charge, after defining "adequate cause" as to the facts proven, to fail to apply the law directly to such facts. See opinion for a discussion in extenso of a charge upon manslaughter, a greater portion of which was inapplicable and should not have been given, and where the portion which was applicable, was not applied to the particular facts.

**4. Charge of Court to Jury Upon the Impanelment.**

Where the court in the impanelment of the petit jury for the week instructs them generally as to their duties the judge should frame the instructions and be careful to state the principles of law correctly, and be equally careful not to disparage any legitimate defense that may be set up in criminal cases to be tried.

APPEAL from the District Court of Waller. Tried below before Hon. WELLS THOMPSON.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

Appellant was indicted for the murder of Harry Alford, on the 19th day of May, 1899, by shooting him with a gun and pistol. The evidence shows the killing occurred on Friday evening, the 19th of May, 1899, about 3 o'clock p. m., at the mill of Joe Attaway, a brother of defendant. Alford, the deceased, had gone to the mill with August Hager. Hager stopped at the mill to wait for Joe Attaway, who was absent at the time, but was expected to return in a short time. Alford, deceased, went to Joe Attaway's house, which was in sight of and only a short distance from the mill. Defendant, Tom Attaway, came to the mill and was carrying a single barrel shotgun and a pistol. Shortly after his arrival Harry Alford started down towards the mill. When he got within fifteen or twenty feet of defendant, defendant picked up his gun and fired upon him, shooting him in and under the left arm. Defendant then drew his pistol and Alford fell. Defendant then went up to him and fired two more shots into his body. Alford died immediately. He was in his shirtsleeves and had no weapon upon him. The parties had been seen together and were apparently good friends up to a few days of the killing.

But the evidence discloses that deceased, Alford, was the principal witness against defendant in a criminal prosecution for the theft of a beef, the property of one Frank Williford, which prosecution was pending in the District Court of Montgomery County. The theory of the State was that defendant murdered Alford in order to get rid of his testimony in the beef-stealing case. The theory of the defense was that Alford had ravished his (Attaway's) wife on the afternoon of Saturday, the 13th day of May, the week before the killing. Mrs. Attaway testified that she told her husband of the rape on Wednesday, having previously told her father about it the same day. It was claimed by defendant that the killing was done upon his first meeting deceased after he was informed of the rape upon his wife. The questions discussed in the court's opinion below as to the admitted and excluded testimony are so fully presented as to need no further illustration from the record; and the charge of the court upon manslaughter, which is also discussed, is fully presented in the opinion.

With regard to the court's charge to the petit jury upon impaneling them for the week, the same is presented by a bill of exceptions, but is too elaborate for insertion. Suffice it to say the said charge fully instructed upon the duties and responsibilities of jurors. Among other things it stated that in the opinion of the judge "the higher a defendant stands in social life, the severer ought to be the punishment inflicted upon him." It then denounced "the hip-pocket" defense, and the jury were urged to disregard all such testimony as manufactured and false, where the deceased was shown to have had no weapon, but threw his hand behind him as if to draw a pistol which he did not have. A reasonable doubt was explained to the jury, and they were told: "There is always more or less conflict in the testimony in all cases, and this conflict is sometimes purposely injected into the trial for the sole purpose of creating a doubt in the minds of the jurors where there is no other line of defense. But such doubts are not reasonable doubts which justify acquittal."

No further statement necessary.

No brief for either party has come to the hand of the Reporter.

*R. E. Hannay*, for appellant.

*Rob't A. John*, Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years, and he prosecutes this appeal.

In appellant's first and second bills of exception he raises the question as to the admissibility of testimony concerning another offense charged against him. The State was permitted to prove by witness Will Williams that he was present at an interview between C. C. Carter, district attorney of Montgomery County, Texas, and deceased,

Harry Alford, in regard to what he (Alford) would testify in a case then pending against the said Attaway for theft of a beef, and he was permitted to testify that on that occasion he (Alford) and defendant were together, and saw the beef which was afterwards said to be the stolen animal; that defendant asked Alford who gave the TU brand which was on said beef, and Alford replied "Frank Williford," who lived in Houston, and that he owned the beef. Defendant then and there stated that when the beef got fat he intended to kill it, and it was the same beef defendant was charged with stealing. Defendant excepted to this testimony on the ground that it was hearsay, irrelevant, and prejudicial to defendant, and on the further ground that it was an ex parte statement, made to a third person, in the absence of defendant, regarding a case for which he was not then being tried. The court explained this bill by stating that at the time, and immediately after the court admitted the testimony, counsel for defendant stated he would ask to be allowed to prove by other witnesses what the said Alford had said about the cattle-theft case, and counsel did so with the consent of the court. And the State was further permitted to prove by Isaac Jackson that he had a conversation with Alford on another occasion, and that he told him substantially the same thing. The same objections were urged to the admission of this testimony, and the court appended the same explanation. Appellant was on trial charged with the murder of Harry Alford, and the theory of the State was that the motive actuating him in the homicide was because deceased, Alford, was a witness against him in the cattle-theft case. Unquestionably, it was competent for the State to prove by legal testimony that this was the motive for the homicide. Kunde v. State, 22 Texas Crim. App., 65; Hudson v. State, 28 Texas Crim. App., 328. But the State failed to connect appellant with these conversations; that is, there was no testimony showing that appellant knew the nature and character of the testimony of the deceased against him in the cattle-theft case. He may have known, and doubtless did know, that deceased was a witness against him in that case; and it may have been competent for the State to prove that fact. But, in the absence of some knowledge on the part of defendant that he knew the nature and character of deceased's testimony against him, or that he knew what deceased had told the district attorney or Jackson, we do not believe the testimony here complained of was admissible. The explanation of the court by no means renders the testimony admissible. He merely showed that, after he had admitted the testimony, over appellant's objection, his counsel then insisted on proving what the said Alford had said about the cattle-theft case. Of course, after illegal testimony was admitted, defendant could but make the best of the situation, and then offer other testimony, if he had it, and rebut or destroy the effect of the illegal testimony. What we have said above disposes of appellant's three bills of exception with reference to the argument of the district attorney, C. L. Carter.

The next bill of exceptions is to the argument of the district attor-

ney in his closing speech, stating that the deceased, Harry Alford, had a pistol on a certain occasion, as testified to by defendant John Attaway. Appellant objected to this statement, because Attaway had not testified, and there was no testimony suggesting, that deceased had a pistol on the occasion alluded to. When this was made to appear, the court should have promptly excluded the statement, and admonished the district attorney to keep within the record.

Appellant, in his motion for new trial, excepted to the charge of the court on manslaughter. We have examined the charge carefully, and, in our opinion, appellant's objections thereto are well taken. To present this matter clearly, we will state the respective theories of the State and defendant as presented in the testimony. According to the State's theory, the homicide was a murder without justification or excuse,—that is, the State's evidence strongly showed that appellant came to the mill where deceased was, armed with a shotgun and a six-shooter; that, as soon as he saw deceased approaching from a house near by, where he had gone, without any hostile act or demonstration on the part of deceased, he shot him down, first using a shotgun, and then, after deceased fell, he approached his prostrate body, and shot him twice with a six-shooter. Defendant's testimony—at least, some of it—tends to show self-defense; that is, that when deceased approached where defendant was he made a movement as if to get a pistol. No arms, however, were found on deceased. In addition to this, appellant offered certain testimony to the effect that deceased, a few days prior to the homicide, had carnal intercourse with his (appellant's) wife by force; that, on his return home, his wife informed him of deceased's conduct; and that he killed defendant on the first meeting thereafter. On this theory appellant claimed that, if he was guilty at all, he could not be convicted of more than manslaughter. Now, the court gave a charge on manslaughter, which was very elaborate; the greater portion thereof not only having no application to the evidence in the case, but being absolutely in the face of the testimony. For instance, he instructed the jury as to the statutory definition of "manslaughter," defining to them "adequate cause," and that such adequate cause must be the provocation arising at the time of the commission of the offense, and must not be the result of a former provocation; that it must engender passion, which rendered appellant's mind at the time incapable of cool reflection. He further told the jury that, while they must be confined to the provocation at the very time of the commission of the offense, in determining the adequacy thereof they might consider, in connection therewith, all the facts and circumstances in evidence in the case, to determine whether or not appellant's mind, at the time of the killing, was incapable of cool reflection. Then, after giving these statutory definitions, he instructed the jury, if they believed the killing occurred under the circumstances as defined under the charge on manslaughter, to find him guilty of that offense. After giving this charge—which had no application whatever to the facts of this case requiring a charge on manslaughter—the

learned judge then proceeded to instruct, in effect, that insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide was adequate cause to reduce the murder to manslaughter; that, in order to render this defense available, four things must concur: First, there must be insulting words and conduct on the part of the deceased towards a female relative of the accused; second, that such insulting words or conduct was the real provocation which induced the killing; third, that the killing took place immediately on the happening of the insult, or as soon thereafter as the accused, having been apprised thereof, met with deceased; and, fourth, that accused, when he killed deceased, was affected by such a degree of anger, rage, resentment, or terror as would commonly, in a person of ordinary temper, render his mind incapable of cool reflection. After concluding this definition of "adequate cause," no charge then was given applying this law to the particular facts in the case. Why the learned judge took the pains to give an elaborate charge on "adequate cause," not applicable at all to the case, and instructed the jury in regard thereto, when there were no facts to authorize it, was strange enough; but why he should then define an adequate cause applicable to the facts proven, and not apply the law to the facts, is inexplicable. The first charge should not have been given at all, because there was no evidence requiring it; and it was antagonistic to the only adequate cause in the case, in that it confined the jury to a provocation given at the time, when there was no such provocation claimed, but an entirely different provocation, not arising at the time. The charge was misleading and confusing, and its effect was to deprive defendant of the benefit of his defense of manslaughter altogether.

There is also a lengthy bill of exceptions to a charge given by the judge on the impanelment of the jury for the week, said charge being delivered in the presence of some of the veniremen who tried this case. Some of the expressions used in said charge may be the subject of criticism. Certainly, if such a charge had been given in the case on trial, it would be cause for reversal. Of course, we would not undertake to lay down rules for the guidance of district judges with reference to the instructions of petit jurors on their impanelment in a general way with reference to their duties; but, in our view, a judge in framing such instructions should be careful to state the principles of law correctly, and should be equally careful not to disparage any legitimate defense that may be set up in criminal cases to be tried. It is the peculiar province of juries to hear the testimony in each particular case which they may try, and they should do so unhampered by any general criticisms or animadversions of the judge, made before them in his official capacity, in disparagement of any particular kind of evidence or any particular kind of defense. The complaint here is that the charge as given on the trial and the general charge given by the judge on the impanelment of the jury for the week are not in harmony, and the general charge was calculated to give the jury greater latitude, especially on the issue of apparent danger, than was authorized by law,

and thus to abridge and disparage appellant's right of self-defense. While, as stated above, the charge is subject to criticism in this respect, yet we are not prepared to say that it had the effect claimed for it by appellant, inasmuch as the jury impaneled to try the case was sworn to take the law from the court; not the law in some other case, or on some other occasion, but the law given them in the particular case.

For the errors heretofore pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, PRESIDING JUDGE, and BROOKS, JUDGE.—We concur in the reversal, and further state that the judgment should have been reversed on the last question discussed, and will state our reasons.