**Clive Anthony HOWLETT, Appellant,**

v.

**The STATE of Texas, Appellee**

**No. 08–84–00241–CR.**

Court of Appeals of Texas,
El Paso.

Nov. 27, 1985.

Howell Cobb, III, Sylvia Gomez, Scott, Hulse, Marshall, Feuille Finger & Thurmond, El Paso, for appellant.

Steve Simmons, Dist. Atty., El Paso, for appellee.

Before WARD, OSBORN and SCHULTE, JJ.

### OPINION

SCHULTE, Justice.

This is an appeal from a conviction for murder. The court assessed punishment at seventy years imprisonment. We affirm.

The deceased, Pamela Rosario, was in the United States Army, stationed at Fort Bliss, Texas, as was her husband, Angel Rosario. They had separated but were not divorced at the time of her death. She was residing in the barracks on the military base. At approximately midnight October 18, 1983, the deceased and her roommate Clestine Lamon heard a knock on their door. Rosario answered, reentered briefly, and then left for approximately fifteen minutes. When she returned she conversed briefly with Lamon. The State and the trial court did some unnecessary tiptoeing around what they apparently perceived to be a serious hearsay problem. Instead of directly inquiring into hearsay expressions of Rosario's state of mind and intentions, Lamon was asked what she said in response to Rosario. She responded by saying that she advised Rosario that she did not have to give the Appellant Howlett a ride anywhere because he had not been invited over, it was after the barracks curfew hour and she had been drinking. In any event, it is readily apparent that these were the admissible voiced intentions of Rosario. *Walters v. American States Insurance Company,* 654 S.W.2d 423, 425, 427–428 (Tex.1983); *Elledge v. Great American Indemnity Company,* 312 S.W.2d 722, 724–725 (Tex.Civ. App.—Houston 1958), *affirmed,* 320 S.W.2d 328 (Tex.1959) (specifically upholding the admissibility of such hearsay declarations of intent); *West v. State,* 2 Tex. Cr.R. 460, 474 (1877). *See also:* 6 Wigmore, Evidence, sec. 1725–1726 (Chadbourn rev. 1976); McCormick, Evidence, sec. 295 (3rd ed. 1984). Pamela Rosario did not report for duty the next morning and was carried by the military as absent without leave. Her vehicle, a 1982 Datsun 200 SX with Texas license plate 291 AJG, could not be located. On October 28, 1983, her body was located in the desert area east of El

Paso. Her hands and feet had been bound with white athletic shoelaces. A horizontal laceration was located in the left rear portion of her head, consistent with a blow by a blunt instrument sufficient to render the victim unconscious. Cause of death was determined to be burning, initiated by the use of an accelerant. Examination of the larynx, trachea and bronchi indicated that she was alive at the time the accelerant was ignited. Time of death was estimated to be one week earlier, give or take two days. This was consistent with her disappearance after the midnight departure on October 18. Subsequent investigation disclosed her dating relationship with the Appellant and their intended departure together in her vehicle on the night of October 18. Appellant's probable location in Grand Island, Nebraska, was learned through his mother in El Paso. The El Paso Sheriff's Office obtained a vehicle theft complaint from the deceased's husband. The Grand Island, Nebraska Police Department was notified and requested to look for Appellant and the vehicle, due to suspicion of murder and felony theft. On October 29, Appellant was observed driving the vehicle in Grand Island. He was placed under arrest and El Paso authorities were notified. The Nebraska authorities made no interrogation effort and impounded and sealed the vehicle. The El Paso Sheriff's Department obtained two arrest warrants (murder and theft) from County Court at Law Judge John Fashing. The Grand Island police were notified of the warrant numbers, charges and the issuing magistrate, as well as the fact that El Paso Sheriff Davis and Deputy Bonilla were preparing to leave for Grand Island with the warrants in their possession. Meanwhile, a county court judge in Nebraska appointed counsel to represent Appellant for extradition proceedings. Appellant Howlett attempted to contact the attorney but was unable to do so because the latter was engaged in trial in another town.

On November 1, 1983, El Paso Sheriff Davis and Deputy Bonilla arrived in Grand Island with the two warrants. At their request, Howlett was brought into an inter-

view room at the police department. Both officers were aware that counsel had been appointed. Deputy Bonilla noticed that the laces in Appellant's athletic shoes did not seem to match the shoes. Being aware of the bindings used on the victim's hands and feet, he seized the shoes and laces. Over the course of November 1 and 2, the El Paso officers obtained a tape recorded exculpatory statement from Appellant, a consent to a vehicular search and a waiver of extradition. The victim's vehicle was searched in the police impound lot. Bonilla secured blood samples from the trunk and a seat cover, soil samples from the interior floorboard and a tire tool. Appellant returned to El Paso on November 3 by airplane with Deputy Bonilla. Sheriff Davis drove the victim's car back to El Paso. It was returned to the victim's spouse, Angel Rosario. Later, he drove it to Lawrence County, Alabama, and gave it to the victim's mother.

Once Appellant was returned to El Paso, he gave a written confession to the offense. Expert analysis identified the soil samples removed from the vehicle as matching the soil samples taken from beneath the body of the victim. The blood sample taken from the vehicle trunk lining matched the victim's blood in grouping, three enzyme groups and one serum protein, shared by 4.7% of the population. The blood samples removed from the interior were insufficient in quantity to arrive at more than a designation of human origin.

■ Appellant's first four grounds of error relate to the trial court's ruling on his suppression motion and the resulting evidentiary presentation at trial. Prior to trial, Appellant sought to suppress the tape recorded statement, the written confession, the tennis shoes, the blood and soil samples from the vehicle, the tire tool and the photographs of the interior of the vehicle on three grounds: (1) there was a material misrepresentation in the affidavit of Deputy Sheriff Gary Gabbert which was used to secure the two arrest warrants; (2) the arrest warrants were invalid due to the magistrate's failure to designate his office

in either the body of the warrant or in connection with his signatures; (3) the Sheriff and his Deputy initiated reinterrogation of Appellant after invocation of silence and appointment of counsel in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and all of the above cited evidence was directly produced by such action. The trial court agreed with the defense concerning the defect in the magistrate's arrest warrants, declaring them invalid. He further found that the officers had violated *Edwards v. Arizona* and suppressed the tape recorded statement and the written confession. He did not, however, rule upon the issue presented concerning Deputy Gabbert's affidavit and such issue was not pursued by objection. It has in effect been abandoned in the trial court. We note, however, that a common sense reading of the affidavit in light of the subsequent testimony reveals that the error was not calculated to deceive and did not in fact depict probable cause which did not otherwise exist. Gabbert stated that "the owner of the vehicle was seen departing William Beaumont Army Medical Center Building 7055 in the above described vehicle along with the defendant" (theft affidavit) and "Rosario was last seen in the company of the above defendant alive on On [sic] Octocber [sic] 19, 1983 at approximately 12:20 AM" (murder affidavit). The above descriptions were somewhat careless renditions of the information provided by Clestine Lamon. As noted above, Lamon did not actually "see" the two depart together. Rosario answered a knock at the door, spoke to someone in the hall, reentered, dressed and told Lamon she was going to give Tony Howlett a ride in her car. The semantic difference was insufficient to vitiate the affidavits or warrants. A more precise quotation of the information source would have provided the same degree of contribution to the overall probable cause demonstration in the affidavits.

■ With regard to the continued assertion of *Edwards v. Arizona*, we note simply that the doctrine applies to verbal or testimonial fruits of improper police conduct and physical evidence produced in turn by those testimonial results. The taped statement and written confession were suppressed. The other challenged items of evidence were not tainted *Edwards* byproducts. The improper statements did not lead to their seizure. They present Fourth, not Fifth, Amendment problems. Thus, there are two evidentiary areas of concern: the seizure of the tennis shoes and the seizure of various items from the vehicle.

■ The sole question presented with regard to the tennis shoes is how the seizure and admission of the tennis shoes can be sanctioned given the trial court's finding that the arrest warrants were invalidated. Tex.Code Crim.Pro.Ann. art. 15.02(3) (Vernon 1977) dictates that the inclusion of the issuing magistrate's office, in either the body of the warrant or in connection with his signature, is a substantial requisite of a valid arrest warrant. We consider it a given premise that the two warrants before us present error in this regard. We do not need *Gish v. State*, 606 S.W.2d 883 (Tex. Crim.App.1980) to reach that conclusion. What *Gish* and any other case authority fails to indicate is the proper consequence of such error. Appellant of course contends that the invalid warrants mean that the custody of the Appellant, *at least* from the time the El Paso authorities arrived with the warrants, was unlawful and that any seizure made as a result of and during such custody was subject to the State and Federal exclusionary rule. Such a conclusion, while arguable, is not expressly dictated by either statute or case authority. In evaluating the sufficiency of the other statutory substantial requisites of a warrant—name or description of the accused and name of the alleged offense—the Court of Criminal Appeals has at least in part measured the cases against the purposes of Article 15.02 and not simply imposed a mechanical application of the statute. *See: Archer v. State*, 607 S.W.2d 539, 543 (Tex.Crim.App.1980); *Walthall v. State*, 594 S.W.2d 74, 80–81 (Tex.Crim.App. 1980); *Jones v. State*, 568 S.W.2d 847, 851– 854 (Tex.Crim.App.1978). Taking that ap-

proach, we consider the purpose of the third requirement of Article 15.02 to be the elimination of any doubt that the seizure order has been based upon a probable cause determination made by a judicial magistrate, consistent with due process protections from unbridled police action, and not upon a non-judicial decision. *See: Haynes v. State*, 468 S.W.2d 375, 378 (Tex. Crim.App.1971), *cert. denied*, 405 U.S. 956, 92 S.Ct. 1180, 31 L.Ed.2d 233 (1972). The express inclusion of the magisterial source provides a ready reference for those charged with the seizure, custody and transportation of the arrestee, no matter how remote those custodians be from the investigation of the offense or probable cause presentation. While County Court at Law Judge Fashing's unquestionable authority as a magistrate did not appear in the warrant as required by Article 15.02, his actual office was indicated to the Nebraska authorities by telegram prior to the arrival of the El Paso Sheriff and his deputy. The telegraph indicated the warrant numbers, charges, identity of the accused, issuing magistrate's name and his office as county court at law judge. Thus, at any moment subsequent to arrest, any judicial officer, police officer or attorney had in fact immediate access to the information that the probable cause determination had been made by a proper, neutral detached magistrate. Thus, despite the error on the face of the warrants, the purpose behind the statute was served.

■■■ We further note that under *Gish* an arrest authorization may be appended to a search warrant without satisfying the requirement of Article 15.02. If so, such an error in an arrest warrant should not logically result in automatic application of the exclusionary rule.

As a further basis for upholding the seizure and admission of the tennis shoes, we have considered Appellant's argument from the standpoint of a hypothetical habeas corpus challenge. His contention is unlawful restraint under void warrants, leading to a tainted seizure of physical evidence. A traditional approach to asserted unlawful restraint is habeas corpus relief. Had Appellant immediately challenged his detention via habeas corpus upon defective issuance of the warrants, what would be the consequence as to detention and seizure? Tex.Code Crim.Pro.Ann. art. 11.45 (Vernon 1977) provides that answer:

If it appears that the applicant is detained or held under a warrant of commitment which is informal, *or void* [emphasis added]; yet, if from the document on which the warrant was based, or from the proof on the hearing of the habeas corpus, it appears that there is probable cause to believe that an offense has been committed by the prisoner, he shall not be discharged, but shall be committed or held to bail.

For "document on which the warrant was based", read Gabbert's affidavits; for "proof on the hearing of the habeas corpus", read suppression hearing. Then by analogy, despite a finding of void warrants, the underlying probable cause demonstration would justify the continued detention. If the detention could have been legitimately continued, then the seizure of the tennis shoes would be proper under *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In conclusion, we find no error in the admission of the tennis shoes despite the defect in the arrest warrants. Grounds of Error Nos. Three and Four are overruled.

Turning to the officers' intrusion into the vehicle, there would seem to be three theories supporting such action: (1) probable cause for theft of the vehicle; (2) third-party consent; (3) no violation of a reasonable expectation of privacy in the vehicle. We dispense with the asserted consent to search by Appellant himself. Apart from voluntariness considerations and apparently unbeknownst to the participants in the trial court, the consent authorizes the search of an undescribed vehicle at "213 Lincoln # 6, Grand Island, Nebraska." From testimony at the hearing, that was the address at which Appellant had been staying. The vehicle of interest, whose description was fully known to the officers,

was sealed with tape and sitting in the police impound lot. In any event, we find it unnecessary to determine whether or not this consent authorized the actual search conducted.

■ The first theory noted above was seizure and search based upon probable cause that the vehicle had been stolen. *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). In support of such an assertion, the following facts present probable cause: the deceased left her barracks at approximately 12:00 midnight October 18, indicating that she was taking the Appellant for a ride in this vehicle; despite being a model soldier, the deceased did not report for duty the following morning and was reported AWOL; her vehicle could not be located; her body was discovered on October 28 and autopsy revealed a time of death at or near her departure with her vehicle on the night of October 18. Probable cause does not necessitate the exclusion of exculpatory explanations of subsequent possession of her vehicle. The facts above, however, do establish probable cause to reasonably believe that the disappearance of her vehicle was associated with her death and therefore not consensual. The fact that the theft complaint was filed by her separated husband we do not find controlling under this theory of seizure.

■ The husband's status is significant in the context of the second theory—third-party consent. At both the suppression hearing and the trial on the merits, Angel Rosario asserted an ownership interest in the vehicle. Evidence indicated that the vehicle was purchased while the Rosarios were still living together. Title was taken in her name, payments were made by her and she had managerial control over its use. Angel Rosario did, however, have access to and did use the vehicle. He had a colorable community property interest (particularly after his wife's body was discovered) which was not rebutted by the defense and which, even if rebuttable, would support the characterization of the resulting sheriff's office reliance on his assertion as reasonable. Thus the officers seized the vehicle on behalf of one asserting an ownership interest for return to his custody in El Paso. Implicit in such authorization was the consensual entry into and examination of the vehicle.

■ Finally, we turn to a consideration of Appellant's expectation of privacy in the vehicle. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). As an abstract exculpatory theory of possession, one might hypothesize that the possession was with Pamela Rosario's consent, given prior to her death. This would of course give rise to a reasonable expectation of privacy. That expectation, however, would evaporate upon learning of her death. Thus, regardless of what was done with his person, the Fourth Amendment protection of the vehicle's interior from police scrutiny was no longer within Appellant's reasonable expectations from the time the deceased owner's property was located and seized. Probable cause for theft and Angel Rosario's ownership interest are irrelevant to this theory of intrusion.

In short, the various facts presented by this record demonstrate a multitude of justifications for upholding the search of the vehicle and no basis for concluding that Appellant's Fourth Amendment rights were violated. Appellant makes a passing multifarious complaint as to the chain of evidence with regard to the soil and blood samples and the tire tool. Having examined the record, we conclude that the chain was adequate for admission and that the objections go only to the weight of the evidence. Grounds of Error Nos. One and Two are overruled.

■ Ground of Error No. Five asserts that the trial court erred in failing to quash the jury panel due to remarks made by the judge presiding at the summoning of the weekly array. Appellant also complains of a voir dire comment made by the trial judge to the panel assigned to his court. No objection was raised to this lat-

ter comment. Therefore, any error presented by the latter comment has not been preserved for review. The earlier comment by a different judge at the Friday array was as follows:

> Let's say you have a criminal trial and it's a serious case, and if it's going to trial he knows he's going to be convicted, he's going to do everything that he can to get off on a technicality.

The remark was uncalled for and not an appropriate comment at any stage of the jury formation process. However, it was made as an abstract proposition by a different judge than the one presiding over this trial, and was made to the weekly array for all eleven district courts and five county courts at law. There was no attempt to show, much less actual showing, that any member of the panel assigned to this trial court or any member of the petit jury ultimately selected heard, remembered, appreciated or was prejudicially affected by the remark. Such a showing was made of record and relied upon by the Court of Criminal Appeals in each of the older cases relied upon by Appellant. *Redwine v. State,* 85 Tex.Cr.R. 437, 213 S.W. 636 (Tex. Crim.App.1919); *Edwards v. State,* 61 Tex. Cr.R. 307, 135 S.W. 540, 545 (Tex.Crim. App.1911); *Chapman v. State,* 42 Tex. Cr.R. 135, 57 S.W. 965 (Tex.Crim.App. 1900); *Attaway v. State,* 41 Tex.Cr.R. 395, 55 S.W. 45 (Tex.Crim.App.1900). In order to quash an array, a defendant must show actual harm in the former being forced to accept an objectionable juror. *Esquivel v. State,* 595 S.W.2d 516 (Tex.Crim.App.1980); *Hurd v. State,* 513 S.W.2d 936 (Tex.Crim. App.1974). That has not been demonstrated here. Ground of Error No. Five is overruled.

In Ground of Error No. Six, Appellant contends that the court erred in refusing both a circumstantial evidence charge and an instruction defining reasonable doubt. The circumstantial evidence charge was dispensed with in *Hankins v. State,* 646 S.W.2d 191 (Tex.Crim.App.1981). Appellant incorrectly states that the *Hankins* court "overlooked" the reasonable doubt instruction requirement in *Holland v.*

*United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, (1954). It was not overlooked; it was rejected by a five-to-four vote, Judge Miller concurring in part and dissenting in part on that precise issue and the same question being addressed by the other three dissenters. We adhere to the majority position and find no error in the charge in this regard. Ground of Error No. Six is overruled.

■ Grounds of Error Nos. Seven and Eight address the question of the sufficiency of the evidence. The current standard of review is whether viewed in a light most favorable to the verdict the evidence was such that any rational trier of fact could affirmatively find each and every element of the offense beyond a reasonable doubt. *Taylor v. State,* 684 S.W.2d 682 (Tex.Crim. App.1984). In this case, the verdict-favorable evidence reasonably demonstrated that: (1) the victim left with the Appellant shortly after midnight October 18 in her Datsun vehicle; (2) although characterized as an outstanding soldier, the victim failed to report for duty the following morning and she was reported AWOL; (3) neither she nor her vehicle could be located; (4) while her husband occasionally used the vehicle, it was her custom not to loan it to anyone else; (5) on October 28 her body was found in the desert east of El Paso; (6) she was burned to death, with the estimated time of death consistent with her departure with Appellant on the night of October 18; (7) a laceration was located on the left rear portion of her head, indicating a blow sufficient to render her unconscious; (8) the pathologist gave his opinion that the blow could have been delivered shortly before her death; (9) the victim's feet and hands were bound with athletic shoelaces; (10) on October 29, Appellant was arrested in Grand Island, Nebraska, driving the victim's vehicle; (11) human bloodstains were found on a seat cushion and more bloodstains were found in the trunk, the latter matching the victim's blood in grouping, three enzymes and one serum protein type (all shared by only 4.7% of the population); (12) soil samples found on the floorboard of

the vehicle matched the soil beneath the dead body; (13) at the time of arrest, Appellant was wearing athletic shoes with laces that did not correspond in size to those typically sold with those shoes. We consider the evidence sufficient to support the jury's verdict. The bloodstains and soil samples support a conclusion that the separation of the vehicle from the victim occurred in connection with the blow to her head and her ultimate death, rendering subsequent possession of the vehicle nonconsensual. The only non-incriminating hypothetical explanations of Appellant's possession would be prior lending of the vehicle or a subsequent acquisition without knowledge of the victim's death. Both theories are refuted by the bloodstains, soil samples, estimated time of death and evidence of the victim's practices in not loaning her vehicle. Grounds of Error Nos. Seven and Eight are overruled.

The judgment is affirmed.