**James Edward MAY, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**Nos. 05–88–00961–CR, 05–88–00962–CR.**

Court of Appeals of Texas,
Dallas.

Nov. 2, 1989.

Ted Redington, Dallas, for appellant.

Anne B. Wetherholt, Dallas, for appellee.

Before McCLUNG, THOMAS and OVARD, JJ.

## OPINION

THOMAS, Justice.

James Edward May appeals from two convictions of unlawful possession of a controlled substance, to wit: amphetamine. The dispositive issue is whether May's estranged wife, Barbara May, or his stepdaughter, Rhonda Nowell, age eighteen, had authority to consent to certain searches of his residence. We conclude that they did not. Accordingly, we reverse the trial court's judgments and we remand the causes for proceedings in accordance with this opinion.

## FACTUAL BACKGROUND

Until mid-August, 1987, May, Barbara, Nowell, and another daughter, resided in a home in Lancaster, Texas. Because of difficulties with May, Nowell moved out. At the time Nowell left, she took "everything that was important" to her. Although she had no intention of returning to the home, Nowell kept a key. Approximately one week later, Barbara also moved out and established a new residence.

Barbara contacted Nowell and told her that she had moved and that she intended to divorce May. Barbara sought Nowell's help in developing a plan to get law enforcement officials to search May's residence. According to Nowell, Barbara wanted to "set up" May and have him arrested because she was afraid, angry and she wanted to hurt him. A meeting was arranged in a motel room in Lufkin between Barbara, Nowell, a private investigator, and Michael Tandy, a Houston narcotics investigator with the Department of Public Safety. At this meeting, the participants decided that the easiest and quickest method of searching May's home was for Nowell to take Officer Tandy to the house and use her key to enter the premises. Barbara called former neighbors in order to ascertain May's schedule. Having determined that May would not be at the residence, Nowell and Officer Tandy drove to Dallas. They arrived late in the evening and entered the house. Based upon information provided by Barbara, they immediately proceeded to the garage area. No-

well did not observe any illegal substance during the search. However, Officer Tandy discovered a liquid substance in a refrigerator in the garage, which he concluded was amphetamine or methamphetamine. Nowell, scared and nervous because she knew that she was not supposed to be in the house, insisted that they leave after approximately fifteen minutes. Nowell and Officer Tandy stayed in the Dallas area that evening to wait for additional law enforcement officers from Houston. The next morning Officer Tandy and DPS Officer Doug Wyman obtained a search warrant based upon Officer Tandy's observations during his search with Nowell. The warrant was executed and certain items were seized. Following an indictment for possession of less than 400 grams but more than 28 grams of amphetamine, May filed a motion to suppress, challenging Barbara's authority to consent to the search of his home.

On April 21, 1988, four days after May filed his motion to suppress, law enforcement officials conducted a second search of the residence, again relying upon Barbara's consent. As a result of this search, May was indicted for possession of amphetamine in an amount less than 28 grams. A second motion to suppress was filed. A synopsis of the stipulated facts offered at the hearing on the second motion to suppress is as follows:

Barbara May, the wife of James May, voluntarily vacated the couple's jointly owned house in Lancaster, Texas, in August of 1987. She left the premises with the intention of terminating her marriage to James May.

On April 21, 1988, Barbara May gave her consent to law enforcement officers to search the May residence in Lancaster. At the time of the search, James May was in jail and the searching officers were aware of that fact. The officers conducted their search of the premises relying upon Barbara May's consent, feeling in good faith that she had the authority to give such consent. As a result of the search, a controlled sub-

stance was discovered in the May residence.

At the time of her consent to search the house, Barbara May had no intent to have a marital relationship with James May and, in fact, intended to file for divorce. She did file for divorce three weeks later. Barbara May had taken up separate residence in White Oak, Texas, over six months before she gave her consent to search the May residence, and she had not been inside that residence during the entire six-month period, although she still had community property in the home.

Both motions to suppress were overruled. Pursuant to plea bargain agreements, May pleaded guilty to each offense. May was sentenced to fifteen years' confinement on the first offense and five years' imprisonment under the second indictment. Pursuant to rule 40(b)(1) of the Texas Rules of Appellate Procedure, May filed his appeals, which we now consider jointly.

## MAY'S ARGUMENTS

In arguing that Barbara did not have authority to consent to either search, May maintains that we should be guided by the principles set forth in *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). In *Matlock*, the Supreme Court upheld the validity of a voluntary consent to search the defendant's bedroom which was given by a woman who lived in the same house as the defendant. The woman giving the consent jointly shared the bedroom with the defendant and she had, on various occasions, been referred to as his wife. In upholding the validity of the search, the Court emphasized that third party consent was allowable when the person giving consent possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993. The court defined in a footnote what it did and did not mean by "common authority."

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7 (citations omitted).

May contends that the right the *Matlock* court sought to protect was the right of privacy and, thus, a person may not consent to the search of property in which that person does not also have a privacy interest. May argues that since Barbara voluntarily left the community residence intending not to return and also intending to end the marital relationship, she no longer had any privacy interest in the home. In this connection, he asserts that there must be common usage and control of the premises at the time the consent is given. At oral argument, May further challenged Barbara's consent because of her open and obvious antagonism toward him and his interests.

## STATE'S ARGUMENT

The State contends that Nowell, as a former resident in the home, had authority to consent to the initial entry because she retained a key and could come and go as she saw fit. Further, the State relies upon the fact that Texas is a community property state and, therefore, Barbara had a property interest in the residence. By virtue of this community property interest, Barbara had authority to occupy and use the residence. Thus, the State argues that Barbara had a "sufficient relationship to the premises" to enable her to validly consent to the searches.

## CONSTITUTIONAL ANALYSIS

■ In these appeals, May asserts that the two warrantless searches of his resi-

dence were violative of the fourth amendment of the federal constitution, article I, section 9 of the Texas Constitution, and article 1.06 of the Texas Code of Criminal Procedure. He also contends that the use of any evidence obtained in those searches was a violation of article 38.23 of the Texas Code of Criminal Procedure. We note initially that the fourth amendment of the United States Constitution and article I, section 9 of our state constitution are in all material aspects the same. Because our state law does not impose a greater restrictive standard than the fourth amendment of the United States Constitution, we are free to follow the lead of the United States Supreme Court. *Eisenhauer v. State,* 754 S.W.2d 159, 164 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988).

■ The constitutional guaranty against unreasonable searches and seizures makes the right of privacy one of the unique values of our citizenship. The security of privacy against arbitrary intrusion by law enforcement is at the core of the fourth amendment. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).

■ One well-established exception to the general warrant requirement of the fourth amendment is that a search, without a warrant and without probable cause, is proper if voluntary consent has been properly given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). However, when the state relies upon consent to justify a warrantless search, the burden of proof is on the state to show that consent was given by one who was authorized to give such consent. *Schneckloth,* 412 U.S. at 221, 93 S.Ct. at 2044–45.

COMMUNITY PROPERTY INTEREST

VS.

AN INDIVIDUAL'S RIGHT
OF PRIVACY

■ The State argues that since Barbara had a community property interest in the residence, she had a right to use and occupy the house and possessed common authority over it. Therefore, the State contends that Barbara had a "significant relationship" to the premises sufficient to enable her to validly consent to the warrantless searches. Under section 5.22 of the Texas Family Code, Barbara does, indeed, have a statutorily created right to joint management and control of the couple's community property. Section 5.22 states in relevant part: "... the community property is subject to the joint management, control, and disposition of the husband and wife, unless the spouses provide otherwise by power of attorney in writing or other agreement." TEX.FAM.CODE ANN. § 5.22(c) (Vernon 1975). Thus, the question is whether there exists under the United States and Texas Constitutions a right of privacy which overrides Barbara's community property rights. We hold that, under the facts of this case, May's right of personal privacy is superior to Barbara's community property interest in the residence.

In *Roe v. Wade,* 410 U.S. 113, 152–153, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1972), the United States Supreme Court reviewed its earlier decisions regarding the possible existence and extent of a constitutionally mandated privacy right.

> The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas of zones of privacy, does exist under the Constitution. In varying contexts, the Court, or individual Justices, have, indeed, found at least the roots of the right ... in the Fourth and Fifth Amendments, *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1872–1873, 20 L.Ed.2d 889 (1968), *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967) ...

The Court in *Terry* stated: "... 'the Fourth Amendment protects people, not

places,' ... and wherever an individual may harbor a reasonable 'expectation of privacy,' ... he is entitled to be free from unreasonable governmental intrusion." *Terry*, 392 U.S. at 9, 88 S.Ct. at 1873.

An implicit right of privacy under the Texas Constitution has also been acknowledged by Texas courts beginning with the case of *Billings v. Atkinson*, 489 S.W.2d 858 (Tex.1973), in which the Texas Supreme Court stated that "[t]he right of privacy has been defined as the right of an individual to be left alone, to live a life of seclusion, to be free from unwarranted publicity." *Billings*, 489 S.W.2d at 859. More recently, the Texas Supreme Court again singled out a person's home as being within the *Roe v. Wade* "zone of privacy" language by stating:

> While the Texas Constitution contains no express guarantee of a right of privacy, it contains several provisions similar to those in the United States Constitution that have been recognized as implicitly creating protected "zones of privacy." *Cf. Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1972).... Sections 9 and 25 guarantee the sanctity of the individual's home and person against unreasonable intrusion. TEX. CONST., art. I, secs. 9, 25.

*Texas State Employees Union v. Texas Dept. of Mental Health and Mental Retardation*, 746 S.W.2d 203, 205 (Tex.1987).

This Court recently considered the issue of one spouse's intrusion upon the privacy rights of the other spouse in *Turner v. PV International Corp.*, 765 S.W.2d 455 (Tex. App.–Dallas, 1988), *writ denied*, per curium, 778 S.W.2d 865 (1989). One of the issues in *Turner* was the trial court's decision to admit into evidence taped telephone conversations between the appellant and a woman, which were the result of a wiretap placed on the woman's home phone by her husband. Although the wiretap was clearly in violation of a federal wiretap statute, the appellee argued that the statute did not apply to interspousal recordings, citing *Simpson v. Simpson*, 490 F.2d 803 (5th Cir.), *cert. denied*, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). In refusing to follow the *Simpson* rationale, this Court

observed that the purpose of the federal wiretap statute was not only to ensure that courts did not become partners to illegal conduct, but also to protect the right of privacy recognized by the *Billings* court. *Turner*, 765 S.W.2d at 470. Given the context of the *Turner* decision, it is clear that this Court considered one spouse's right of privacy to be as unassailable at the hands of the other spouse as it would be with regard to the actions of any third person.

■ In support of its position that a spouses's community property interest in property gives that spouse the right to consent to a warrantless search, the State relies upon the Texas cases of *Burge v. State*, 443 S.W.2d 720 (Tex.Crim.App.1969), *Smith v. State*, 530 S.W.2d 827 (Tex.Crim. App.1975), and *Howlett v. State*, 700 S.W.2d 751 (Tex.App.–El Paso 1985, no writ). Clearly, the law in Texas is that in a normal and usual marital relationship, a wife may consent to the search of her husband's premises where the consent is given without coercion. *Burge*, 443 S.W.2d at 722. There are two lines of reasoning which uphold the authority of one spouse to consent to a search of their property by another. The first is the "joint control rationale," where the emphasis is on the parties' relationship to the property. The fact that Texas is a community property state has been material in adopting the "joint control rationale." The other basis for upholding a spouse's consent has been the "authorization rationale," where the relationship between the parties is emphasized. *Burge*, 443 S.W.2d at 722 n. 2.

■ The question becomes whether an estranged spouse, under the facts of this case, has such a right. In *Smith*, the court upheld the validity of an estranged spouse's consent to search the house of her murdered husband. As the community survivor, the wife was entitled to possession and control of the couple's community property and, thus, she had a "significant relationship to the premises" under *Matlock*. *Smith*, 530 S.W.2d at 833. Likewise, in *Howlett*, the estranged husband, as the surviving spouse, was held to have

sufficient interest in the automobile of his murdered wife to be able to validly consent to the search of the vehicle based upon his community property interest. *Howlett,* 700 S.W.2d at 757. The facts of the *Smith* and *Howlett* cases are so different from the facts before us that they give little guidance. It is axiomatic that a deceased person can have no privacy interest in the property being searched.

## AUTHORIZATION TO CONSENT BY AN ESTRANGED SPOUSE

We have not been cited nor have we been able to locate a United States Supreme Court decision that directly faces the issue of a spouse's authority to consent to a warrantless search. Although a number of state and federal courts have been called upon to decide similar fact scenarios under the reasoning of *Matlock,* there has been no firm consensus as to whether an estranged spouse has the authority to consent to a warrantless search. Courts appear to look closely at the individual circumstances of each case, considering, among other things, the length of time the consenting spouse has been away from the property, whether the consenting spouse has ready access to the property, and whether the consenting spouse has antagonistic interests to those of the other spouse.

In support of his argument that Barbara had no right to consent to the warrantless searches of his residence, May cites *State v. Verhagen,* 86 Wis.2d 262, 272 N.W.2d 105 (Ct.App.1978) and *Bettuo v. Pelton,* 260 N.W.2d 423 (Iowa 1977), both of which involved drug searches. In *Verhagen,* the defendant's wife signed a form consenting to the search of their property two weeks after she had vacated the property and had initiated divorce proceedings. A temporary court order awarded the use of the premises to the defendant, but ordered him to allow the wife access to remove certain property. Although the defendant's wife was legally a joint tenant and co-owner of the property, the *Verhagen* court held that, under *Matlock,* her property rights did not give her the authority to consent to a search. The court also held that the wife's

limited right of access to the property did not give her a right to consent, especially in light of her later testimony that she had given up her rights to the use and occupancy of the premises. *Verhagen,* 272 N.W.2d at 107.

The court in *Bettuo* followed a similar analysis to find that the estranged wife of one of the defendants could not properly consent to the warrantless search of the defendant's residence, even though she retained joint · ownership in the property. The wife, who had vacated the premises six months previously and had removed most of her possessions, still had a key which she used to let herself and the police into the home. In finding that the warrantless search of the premises was unreasonable and violative of the fourth amendment, the *Bettuo* court held that the estranged wife had no "common authority" over the property, under the reasoning of *Matlock.* Although she had a property interest in the involved premises, she had, "as a practical matter, neither a reasonable expectation of mutual usage thereof nor requisite access to or control of the residence for most purposes." *Bettuo,* 260 N.W.2d at 427.

The State argues that we should follow the rationale of *State v. Madrid,* 91 N.M. 375, 574 P.2d 594 (Ct.App.1978). The State maintains that this case is more persuasive since New Mexico, like Texas, is a community property state. In *Madrid,* which also dealt with a drug arrest, the estranged wife of the defendant consented to a police search of his rented house and used her key to allow entry. The court held that she had enough of a "sufficient relationship" to the premises to come within the *Matlock* exception and, therefore, the warrantless search was lawful. *Madrid,* 574 P.2d at 597. Because of the facts in *Madrid,* we are not persuaded that the case is applicable. This case began when the police were investigating a shooting incident. The husband was shot while sitting in his car in his garage. The police investigators were unable to locate a weapon. At the hospital, the investigators asked the estranged wife if they could check inside the house for a weapon and she agreed. The estranged

wife then met the officers at the residence, unlocked the door with her key and invited them to look around. Marijuana was discovered during the course of the search for the weapon. While it is true that the estranged wife had not been living at the residence for approximately five months, there is no evidence that the parties intended to end the marital relationship. In fact, the court pointed out that the parties had recently attempted a brief reconciliation. Further, there is nothing to indicate that the wife had interests which were antagnostic to that of her husband. On the contrary, it appears that the wife was seeking to assist the police in the investigation surrounding the shooting of her husband. In upholding the warrantless search, the court pointed to evidence that the wife: (1) had a right to occupy the premises; (2) had a key and there was an indication that she had a right of unrestricted access; (3) used the residence to some extent; and (4) left community items as well as some of her separate items in the home. *Madrid*, 574 P.2d at 597.

Although not cited by the State, there are a number of federal cases in which the courts have upheld the validity of an estranged wife's consent to a warrantless search of the defendant's property. *See United States v. Trzaska*, 859 F.2d 1118 (2nd Cir.1988), *United States v. Crouthers*, 669 F.2d 635 (10th Cir.1982), and *United States v. Long*, 524 F.2d 660 (9th Cir.1975). However, we find the facts in those cases to be distinguishable. In upholding the estranged wife's consent in *Trzaska*, the court emphasized the fact that she had only recently moved out and that she had retained a key to the premises. Further, the court noted that she did, in fact, remove some of her personal belongings from the apartment while the police were searching the premises. Based upon these factors, the court determined that she possessed adequate authority to consent. *Trzaska*, 859 F.2d at 1120. The husband in *Crouthers* was implicated by his estranged wife in a bank robbery. The evidence clearly established in *Crouthers* that the wife, although living with her parents at the time, had equal access to the apartment. In fact, the husband on one occasion indicated to FBI agents that he did not have a key to the apartment, but that his wife did. Based upon her access and the fact that the wife had not abandoned her marriage, the court held that she was authorized to consent to the search. *Crouthers*, 669 F.2d at 643. In *Long*, an estranged spouse had the right to consent to a search of her husband's residence even though the locks had been changed. The court seized upon the fact that the wife had been forced to leave the house by the husband. Further, the court stated that the fact that the wife collected some of her things during the FBI searches indicated that she had a joint right of control and was exercising that right. *Long*, 524 F.2d at 661.

One of the factual circumstances that courts have taken into account is whether the consenting spouse has interests which are antagonistic to the defendant spouse. In at least two cases, the courts have held that a warrantless search with the consent of a wife, who was *cohabitating* with her husband at the time, was invalid because the wife's motive in consenting to the search was one of anger, spite and hostility. *State v. Gonzalez–Valle*, 385 So.2d 681, 682 (Fla.Ct.App.1980); and *Kelley v. State*, 184 Tenn. 143, 197 S.W.2d 545 (1946). In *Gonzalez–Valle*, a police search, based upon the wife's consent, uncovered a gun and some narcotics resulting in the husband's arrest. In suppressing the evidence on the basis of an illegal search and seizure, the court held that the motive of the wife in consenting to the search was one of spite and hostility and was made with the intent to harm the husband. The court went on to state that "[u]nder such circumstances the wife had no right to waive her husband's protection against unreasonable searches and seizures any more than any other person would have had." *Gonzalez–Valle*, 385 So.2d at 682. Likewise, where the wife called the police because she was angry with her husband and did her utmost to get him into trouble, the court held that her interests were so contrary to that of the husband that she had no authority to waive his rights against

unreasonable searches and seizures. *Kelley*, 197 S.W.2d at 546. *See also United States v. Mazurkiewicz*, 431 F.2d 839, 843 (3d Cir.1970).

Here the antagonism of Barbara and Nowell toward May at the time of the first consent is well documented in the record. It is also safe to assume that such antagonism on Barbara's part continued at the time she consented to the second search, since she filed for a divorce three weeks later.

## NOWELL'S AUTHORITY TO CONSENT

■ We find no merit in the State's alternative argument that Nowell had authority to consent to the original warrantless search of the common areas of the residence. Nowell admitted that she no longer considered the home to be her residence and that she had taken everything that was "important" when she left. Further, she acknowledged that she did not think she had authority to enter the home. In fact, the evidence demonstrated that she was frightened and hurried the search so that she and Officer Tandy would not be caught. Since she was not living in the house at the time of the first search and she had no ownership interest in any of the property, she had absolutely *no* authority under *Matlock* to give a valid third-party consent to the search.

## GOOD FAITH BY THE POLICE OFFICERS

We are not persuaded by the State's further argument that the law enforcement officers were acting in good faith. It has been held that police officers involved in a warrantless search of a home could not have reasonably believed that an estranged husband had authority to consent to the search of the home in view of the husband's representation that he needed the officers' assistance in gaining admittance to the residence. *People v. Yalti*, 76 A.D.2d 847, 428 N.Y.S.2d 330 (1980). With regard to the initial search, Officer Tandy admitted that he knew that Barbara and Nowell were no longer living at the residence and that they had no intention of returning to the house as long as May was there. Officer Tandy also knew that both women wanted to harm May. Officer Tandy further acknowledged that the surreptitious search of the residence was made specifically to get enough information to support the issuance of a search warrant because the tip given by Barbara regarding the presence of illegal substances was not "fresh" enough, by itself, to enable the officers to obtain a warrant. The officer said that the original plan was to use Nowell as the confidential informant in the warrant, but that he eventually had to serve in that capacity. Nevertheless, Nowell received $1,300 from the Department of Public Safety for her participation in the search of the residence.

Good faith on the part of the officers in the second search of the residence is even more tenuous. The officers knew that May was incarcerated at the time, and they presumably knew that Barbara was not living in the residence and had not done so for at least six months. Further, May had filed a motion to suppress challenging Barbara's authority to consent four days before the second entry.

## CONCLUSION

Under the circumstances of this case, we hold that Barbara and Nowell did not have authority to consent to the warrantless searches of the May residence. We, therefore, sustain the first points of error in each appeal. Since there was no valid consent to the two searches, the evidence complained of was tainted so as to be inadmissible and the trial court erred in denying May's motions to suppress. Having found error in the proceedings below, we hereby reverse the trial court's judgments because we cannot determine beyond a reasonable doubt that the errors made no contribution to the conviction or the punishment. TEX. R.APP.P. 81(b)(2). In view of our disposition of these points of error, it is unnecessary to consider May's remaining contentions. The trial court's judgments are reversed and the causes are remanded for

further proceedings in accordance with this opinion.